FILED
COURT OF APPEALS
DIVISION II

2015 JUN -4 AM 8:33

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 45499-8-II |
| BRENT PETTIS, | PART PUBLISHED OPINION |
| Petitioner. | |

WORSWICK, J. — Brent Pettis appeals his continued civil commitment to the Special Commitment Center (SCC) following a jury verdict in an unconditional discharge trial. He argues that (1) the trial court erred under *Frye*[1] by admitting testimony based on the Structured Risk Assessment–Forensic Version (SRA–FV) tool at trial, (2) his commitment to the SCC rather than the less restrictive Secure Community Treatment Facility (SCTF) violates his substantive and procedural due process rights, (3) the trial court impermissibly commented on the evidence by instructing the jury to disregard Pettis's expert's statements about the law, (4) he received ineffective assistance of counsel because his attorneys made no attempt to rebut the State's expert or to rehabilitate Pettis's expert's testimony, and (5) the trial court erred by admitting evidence of what Pettis's living circumstances would be if unconditionally discharged.

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

No. 45499-8-II

In the published portion of this opinion, we hold that the trial court did not err by admitting testimony based on the SRA–FV tool under *Frye*. In the unpublished portion of the opinion, we disagree with the remainder of Pettis's assignments of error and affirm.

FACTS

In 2002, Brent Pettis stipulated to an order committing him to indefinite total confinement in the Special Commitment Center (SCC). In 2010, 2012, and 2013 annual reviews of Pettis it was concluded that he remained a sexually violent predator (SVP). Some of these annual reviews opined that Pettis could be treated at a less restrictive alternative (LRA) such as the Special Commitment Treatment Facility (SCTF), while others did not.

In 2011 Pettis stopped formal sex offender treatment at the SCC. In 2013 he petitioned for a trial to determine whether he could be unconditionally discharged from the SCC. The trial court granted Pettis's motion for a trial.

After filing his petition for unconditional release, Pettis moved to "seek conditional release in the alternative . . . during the unconditional release jury trial." Clerk's Papers (CP) at 100. The State opposed this motion to expand the scope of the unconditional discharge trial. Pettis later withdrew this motion.

Dr. Amy Phenix, retained by the State, evaluated Pettis. Dr. Phenix based her evaluation of Pettis on, among other things, actuarial and clinical risk assessment tools, including the SRA–FV. Dr. Phenix concluded that Pettis continued to meet the definition of an SVP. She also opined that he was "appropriate for release to a less restrictive placement, the SCTF[,]" but he was "not appropriate for unconditional release." Suppl. CP at 404.

2

Shortly before the unconditional discharge trial was set to commence, Pettis moved the court for a summary order placing him in the SCTF. He alleged that all of the experts who had examined him thought an LRA, such as confinement at the SCTF, would be appropriate. Beyond requesting transfer to the SCTF, Pettis did not provide the statutorily required details about his proposed LRA. The trial court denied this motion.

In preparation for trial, Pettis deposed two administrators at the SCC: administrative services chief Cathi Harris and consulting psychologist and former SCC director Dr. Holly Coryell. Both Harris and Dr. Coryell testified that it was the general practice at the SCC not to recommend for transfer to the SCTF any patient not currently in treatment.

At the unconditional discharge trial, the State presented expert opinion testimony from Dr. Phenix. In response to Dr. Phenix's potential testimony about her evaluation of Pettis, which was based partially on the SRA–FV risk evaluation tool, the trial court held a *Frye* hearing. Dr. Phenix testified that the SRA–FV was widely accepted in the scientific community. At trial, the trial court admitted Dr. Phenix's testimony about the SRA–FV.

On the basis of the SRA–FV and other evaluation tools, Dr. Phenix testified that Pettis was likely to reoffend if unconditionally discharged. She testified that he was in a high risk group when evaluated under either the SRA–FV or other risk assessment tools.

At the time of trial, Pettis hoped to remain at the SCC for about 30 days if released, but he had no fixed plans to do so. He also did not have fixed plans to obtain housing in the community. Pettis moved in limine to exclude certain evidence relating to his release plans. He moved to exclude evidence that he had no plans for where to live if released, and lacked a source of income and a social support network. The State made an offer of proof outside the presence

of the jury that Pettis's lack of housing or income were factors in Dr. Phenix's opinion that Pettis might lack structure and be likely to reoffend if released. The trial court ruled that Dr. Phenix could testify to the relationship between risk of reoffending and a lack of structure. But the trial court excluded any use of words such as "homelessness," "destitute," and "poverty." Verbatim Report of Proceedings (VRP) at 255, 258-59. Over Pettis's objection, Dr. Phenix then testified that support and structure were very important upon release, and that Pettis did not have a source of income, a place to live, or a support network.

Dr. Fisher testified as Pettis's expert witness. On cross-examination, the State engaged in the following questioning with Dr. Fisher:

Q. Do you know what [Pettis's] housing arrangements are, if any?
A. His housing arrangements are that the social worker will find a place for him to go. They're not going to just kick out of the SCC with 20 bucks for a bus ticket.
Q. This is speculation that they will find him a place to live?
A. No, that's the plan. I don't think that—I mean *we know that if he were to be released after this trial, he has to stay in the SCC for a minimum of 30 days* for the community notification process to happen. So I—I think that's enough time to obtain his SSI for disability, get him hooked up with medical insurance providers, and find a place to live with the assistance of the social worker.

VRP at 1055-56 (emphasis added). The State began to impeach Fisher on his understanding of the Sexually Violent Predator Act[2] (SVPA), and Pettis objected.

Outside the presence of the jury, Pettis's attorneys told the trial court that Dr. Fisher was "testifying based on discussions he's had with us," during which the attorneys appear to have told Fisher that SVPs remained in custody for 30 days after release. After hearing argument from both parties about whether the court should permit the State to continue to cross-examine

---

[2] Ch. 71.09 RCW.

No. 45499-8-II

Fisher about the law, the court concluded, "I'm going to instruct the jury that Dr. Fisher's last comments on stating what the law is was inaccurate, to disregard it." VRP at 1065. Then, the trial court instructed the jury as follows:

> Okay. I'm going to give you an instruction. As you heard throughout this trial and particularly at the beginning, there will be times when the Court's going to instruct you on the law. At the conclusion of this trial, I'm going to give you some additional instruction on the law. At this point, one comment I have to make is Dr. Fisher's last statements about what the law was in Washington and the housing, you are to disregard. It was not accurate. It wa—and disregard it. You may move on.

VRP at 1065-66. Pettis did not object. On redirect examination, Pettis's attorneys did not question Fisher further about Pettis's release plans.

The jury answered "yes" to the question: "Has the State proved beyond a reasonable doubt that Brent W. Pettis continues to be a sexually-violent predator?" VRP at 1294. Accordingly, the trial court entered an order committing Pettis to the SCC. Pettis appeals.

ANALYSIS

*FRYE* CHALLENGE

Pettis argues that the trial court erred by allowing the State's expert witness to testify based on the Structured Risk Assessment–Forensic Version (SRA–FV) tool, because it was a novel risk assessment that did not meet the test in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). We disagree.

A.    *Standard of Review*

Our review of the admissibility of evidence under *Frye* is de novo, involving a mixed question of law and fact. *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). We undertake "a searching review which may extend beyond the record and involve consideration of

5

scientific literature as well as secondary legal authority." *Copeland*, 130 Wn.2d at 255-56. We may consider materials that were unavailable until after the *Frye* hearing. *Copeland*, 130 Wn.2d at 256.

After determining that evidence satisfies the *Frye* test, we evaluate the trial court's admission of that evidence under ER 702. *Copeland*, 130 Wn.2d at 256. We review the trial court's decision whether to admit expert testimony under ER 702 for an abuse of discretion. *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988, *review denied*, 337 P.3d 325 (2014). Expert testimony is admissible under ER 702 "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Such testimony is generally helpful to the trier of fact when "it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). As long as helpfulness is fairly debatable, a trial court does not abuse its discretion by allowing an expert to testify. *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001). And even where the helpfulness of expert testimony is doubtful, we favor admissibility. *State v. King County Dist. Court W. Div.*, 175 Wn. App. 630, 638, 307 P.3d 765, *review denied sub nom. State v. Ballow*, 179 Wn.2d 1006 (2013).

B.     *SRA–FV Passes the* Frye *Test*

Courts in Washington adhere to the *Frye* test in evaluating the admissibility of novel scientific evidence. *Copeland*, 130 Wn.2d at 261. Under *Frye*, novel scientific evidence is admissible only where it is based on methods that are generally accepted in the scientific community. 293 F. at 1014. Testimony is admissible under Frye where "(1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant

scientific community of which it is a part;[3] and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results." *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 176 Wn. App. 168, 175, 313 P.3d 408 (2013), *review denied*, 179 Wn.2d 1019, 318 P.3d 280 (2014) (quoting *State v. Sipin*, 130 Wn. App. 403, 414, 123 P.3d 862 (2005)). This standard does not require unanimity. *Lake Chelan Shores Homeowners Ass'n*, 176 Wn. App. at 176. But evidence is inadmissible under *Frye* if there is a *significant* dispute among *qualified* scientists in the relevant scientific community. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 603, 260 P.3d 857 (2011).

We do not attempt to determine whether the scientific theory is correct; our review is merely of whether the theory is generally accepted in the scientific community. *Lake Chelan Shores Homeowner's Ass'n*, 176 Wn. App. at 175-76. We may examine judicial decisions from other jurisdictions, but the relevant inquiry is the general acceptance by scientists, not by courts. *State v. Cauthron*, 120 Wn.2d 879, 888, 846 P.2d 502 (1993), *overruled in part on other grounds by State v. Buckner*, 133 Wn.2d 63, 65-66, 941 P.2d 667 (1997).

1. *SRA–FV Background*

The SRA–FV was released in 2010 by Dr. David Thornton, who previously authored other "static" risk assessment tools.[4] VRP at 327. It is a "guideline for assessing the known

---

[3] Pettis concedes that actuarial tools and clinical evaluations are generally admissible under *Frye*. Thus, Pettis does not argue that the scientific theory or principle upon which risk assessment tools are based lacks acceptance; he argues instead that the SRA–FV tool lacks general acceptance. We analyze only the SRA–FV tool, not risk assessment methods generally.

[4] A "static" risk factor is one that does not change over time, whereas a "dynamic" risk factor may change. VRP at 302. The major static risk assessment tools in use appear to be the Static-99R and the Static-2002R, both developed in part by Dr. Thornton.

dynamic risk factors that predict future sexual re-offense." VRP at 320. It is a "quantitative measure" allowing psychologists to score risk factors and allowing them to "get an idea of the presence of dynamic risk factors in a structured way." VRP at 320. Dr. Phenix used the SRA–FV, among other tools, in her evaluation of Pettis as "a more precise way and structured way of looking at the presence of [risk] factors," and to help identify "which base rates, or what I call norms, to choose to identify the re-offense rates for sexual re-offense." VRP at 321.

The SRA–FV was based on a sample of sexual offenders called the "Bridgewater Sample," which used data from 1954 to 1989. VRP at 333. Dr. Phenix testified that studies had revealed that the same dynamic risk factors (such as those tested in the SRA–FV) were predictive for older samples, such as the Bridgewater Sample, and contemporary samples. This suggests that the age of the sample upon which the SRA–FV was built and tested did not negatively affect its accuracy. At the time of development in 2010, the SRA–FV was cross-validated on the Bridgewater Sample, but it had not been cross-validated since.

Dr. Phenix testified that the inter-rater reliability of the SRA–FV was .55.[5] She characterized this as "modest" reliability, but said that she hoped that in time, after more studies had been done, the inter-rater reliability of the SRA–FV would improve. VRP at 338. She further testified that the statistical predictive accuracy of the SRA–FV was .73, which was a "very acceptable predictive accuracy," comparable to the older Static-99R and Static-2002R

---

[5] "Inter-rater reliability" refers to the likelihood that different practitioners would reach the same result through applying the tool. VRP at 338.

tools. VRP at 341. And the SRA–FV shows "significant incremental validity in improving the risk assessment over use of the Static-99R alone." Suppl. CP at 398.

### 2. *Acceptance of the SRA–FV in the Scientific Community*

At the time of the *Frye* hearing, Dr. Thornton had not yet published a peer-reviewed article describing the SRA–FV. Dr. Thornton recommended the use of the SRA–FV "primarily in sex-offender evaluations where a person has been incarcerated for a period of time." VRP at 327. Dr. Phenix testified at Pettis's trial that the SRA–FV was "fairly widely used with my colleagues," with the caveat that it was a relatively new instrument, "so it takes time to train all the folks who evaluate sex offenders." VRP at 328. She testified that "Dr. Thornton is a very well-known researcher in the field, so [the SRA–FV has] been fairly widely accepted in cases where offenders have been incarcerated for a lengthy period of time." VRP at 340. Dr. Phenix testified that the SRA–FV had been discussed in practitioners' discussion groups online, and she summarized: "My colleagues are excited about it. It's been accepted by—and most people are— are using it." VRP at 344. She said that once an instrument shows "moderate predictability or above, then generally it's accepted in my field." VRP at 344.

At the time of the *Frye* hearing, California had adopted the use of the SRA–FV through legislation. And Dr. Phenix testified that in Washington, "many of the evaluators are using the SRA–FV." VRP at 345. She said she had testified about the SRA–FV in several jurisdictions, and it had only been excluded once in New Hampshire under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) standard.

9

After the *Frye* hearing in 2013, California stopped using the SRA–FV without explanation.[6] It is unclear whether California stopped using the SRA–FV due to rejection by the scientific community or for another reason.

In December 2013, after Pettis's trial, Dr. Thornton published a peer-reviewed article describing the SRA–FV. David Thornton & Raymond Knight, *Construction and Validation of SRA–FV Need Assessment*, SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT XX(X) 1-16 (2013). The SRA–FV has been described favorably in some books: "For non-disabled clients, the [SRA–FV] (Thornton, 2002) . . . enjoy[s] relative degrees of favor, depending on the jurisdiction in which each is used." Robin J. Wilson & David S. Prescott, *Understanding and Responding to Persons with Special Needs Who Have Sexually Offended*, *in* RESPONDING TO SEXUAL OFFENDING: PERCEPTIONS, RISK MANAGEMENT AND PUBLIC PROTECTION 128, 134 (Kieran McCartan, ed., 2014); *see also* Alix M. McLearen et al., *Perpetrators of Sexual Violence: Demographics, Assessments, Interventions*, *in* VIOLENT OFFENDERS: UNDERSTANDING AND ASSESSMENT 216, 231 (Christina Pietz, et al., eds., 2014) (describing the SRA–FV as a "research-guided multistep framework for assessing the risk presented by a sex offender and provides a systematic way of going beyond static risk classification").

One peer-reviewed article by a practitioner in the field criticizes the SRA–FV's approach. Brian R. Abbott, *The Utility of Assessing "External Risk Factors" When Selecting Static-99R Reference Groups*, 5 OPEN ACCESS JOURNAL OF FORENSIC PSYCHOLOGY, 89, 102 (2013). Dr.

---

[6] *Risk Assessment Instruments*, CAL. STATE AUTHORIZED RISK ASSESSMENT TOOL FOR SEX OFFENDERS COMM., http://saratso. org/index.cfm? pid=467 (last visited Apr. 22, 2015).

Phenix responded to this article in the *Frye* hearing: she acknowledged that "there was quite a bit of criticism from a handful of experts that testify only for the defense in these cases, and Dr. Abbott is one of them." VRP at 352. Dr. Fisher mildly criticized the SRA–FV in his evaluation of Pettis: Dr. Fisher stated that the tool suffered from the shortcoming that it was based on an old sample of offenders. But in his testimony at trial, Dr. Fisher conceded that "some" experts rely on the SRA–FV and Dr. Fisher used the SRA–FV to score Pettis's risk in his own evaluation.

We hold that the SRA–FV has been generally accepted in the scientific community. *See Lake Chelan Shores Homeowners Ass'n*, 176 Wn. App. at 175. The sources available, both at the *Frye* hearing below and in the scientific literature, suggest that most practitioners accept the SRA–FV as one of many useful tools to evaluate risk of future sexual offenses. Dr. Phenix testified unequivocally that the tool was widely accepted in her field due to its good predictive accuracy. And there does not appear to be a *significant* dispute about the acceptance of the SRA–FV. There is some criticism from Dr. Abbott and Dr. Fisher, but the *Frye* standard does not require unanimity. *Lake Chelan Shores Homeowners Ass'n*, 176 Wn. App. at 176.

We hold that the scientific theory or principle upon which the SRA–FV is based has gained general acceptance in the relevant scientific community of which it is a part, and thus passes the first prong of the *Frye* test.

3. *Accepted Methods of Applying the SRA–FV*

Dr. Thornton released the SRA–FV at an Association for Treatment of Sexual Abusers meeting, where he held trainings to assist practitioners in applying the tool. Typically, evaluators use the SRA–FV in conjunction with the older Static-99R tool. Dr. Phenix testified that, in addition to the group of researchers who had been trained on the use of the SRA–FV at

the time of its release, several hundred other researchers had been trained to use the tool. The SRA–FV involves a coding form, which appears to be an integral part of the tool to standardize a researcher's assessment.

Dr. Phenix's testimony also suggests there are generally accepted methods of applying the SRA–FV: it involves a specific training and a standard coding form. Pettis argues that the "SRA–FV's low reliability rating, by itself, renders it inadmissible under *Frye*." Br. of Appellant at 20. But *Lake Chelan Shores* does not support this conclusion. Division One of this court in *Lake Chelan Shores* held that one factor of *Frye* admissibility is whether "there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results," but there is no numerical "cutoff" for reliability. *See* 176 Wn. App. at 175. Dr. Phenix testified that the inter-rater reliability rating was "modest," but that practitioners accepted it due to its moderate predictability.

We hold that there are generally accepted methods of applying the SRA–FV in a manner capable of producing reliable results, and thus it passes the second prong of the *Frye* test. Thus, we hold that the SRA–FV passes the *Frye* test.

C. *ER 702: Trial Court Did Not Abuse Its Discretion*

We hold that the trial court did not abuse its discretion by admitting testimony based on the SRA–FV. Under the deferential standard of ER 702, a trial court does not abuse its discretion by allowing an expert to testify when the helpfulness of the expert's testimony is fairly debatable. *Green*, 182 Wn. App. at 146; *Miller*, 109 Wn. App. at 147.

Here, Dr. Phenix's testimony was helpful to the jury. She provided scientific, specialized knowledge about SVPs' risk factors that would assist the jury in determining the likelihood that

Pettis would reoffend if released. Her opinion, based on multiple risk assessment tools, was helpful to the jury by describing risk factors, risk assessment tools, and the likelihood of reoffense based on those tools. We hold that the trial court did not abuse its discretion by allowing Dr. Phenix to testify about the SRA-FV.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

DUE PROCESS CHALLENGES[7]

Pettis next argues that the SVPA, either on its face or as applied to him, violates his substantive and procedural due process rights. We do not reach his constitutional arguments, because they depend on unsupported allegations and an incorrect reading of the SVPA.

A.     *Standard of Review*

We review constitutional questions de novo. *State v. McCuistion*, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012). We presume that statutes are constitutional, and a challenger bears the burden of proving otherwise beyond a reasonable doubt. *McCuistion*, 174 Wn.2d at 387; *In re Det. of Bergen*, 146 Wn. App. 515, 524, 195 P.3d 529 (2008). It is a fundamental principle that we refrain from deciding constitutional issues when a case can be decided on nonconstitutional

---

[7] Pettis's brief contains 27 unlabeled arguments and seven issues in a section entitled "Issues and Assignments of Error." Br. of Appellant at 1-4. The 27 arguments appear to be a summary of the arguments in Pettis's Argument section, and only some assign error to trial court actions. We do not reach assignments of error and issues that were not adequately briefed.

13

grounds. *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 752, 49 P.3d 867 (2002).

B.      *Statutory Scheme*

The SVPA defines an "SVP" as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). After the State has proven that the person is an SVP by a preponderance of the evidence, the Department of Social and Health Services (DSHS) must place the person in a secure facility

> for control, care, and treatment until such time as: (a) The person's condition has so changed that the person no longer meets the definition of a sexually violent predator; or (b) conditional release to a less restrictive alternative . . . is in the best interest of the person and conditions can be imposed that would adequately protect the community.

RCW 71.09.060(1); *see also* RCW 71.09.020(7); 71.09.040. A "secure facility" is "a residential facility for persons civilly confined under the provisions of this chapter that includes security measures sufficient to protect the community," including total confinement facilities such as the SCC, and less restrictive facilities such as the SCTF. RCW 71.09.020(15), (19), (16); 71.09.250(1)(a)(i). During civil commitment, SVPs are entitled to annual review procedures by qualified professionals to ensure that they continue to meet the SVP criteria. RCW 71.09.070.

An SVP may obtain unconditional discharge under RCW 71.09.090 under one of two procedures. First, if the secretary of the DSHS determines that the SVP's condition "has so changed" that he or she no longer meets the definition of an SVP, the Secretary "shall authorize the person to petition the court for . . . unconditional discharge." RCW 71.09.090(1). But

"[n]othing contained in this chapter shall prohibit the person from otherwise petitioning the court for . . . unconditional discharge without the secretary's approval." RCW 71.09.090(2)(a). "If the person does not affirmatively waive the right to petition, the court shall set a show cause hearing to determine whether probable cause exists to warrant a hearing on whether the person's condition has so changed that . . . [h]e or she no longer meets the definition of a sexually violent predator." RCW 71.09.090(2)(a). In other words, while the secretary *may* authorize the SVP to file a petition for unconditional discharge with the court under subsection (1), this section imposes no restriction on an SVP's right to file a petition for unconditional discharge without the approval of the secretary under subsection (2).

Alternatively, an SVP may obtain an LRA to total confinement under RCW 71.09.090, following the same procedure required to petition for unconditional discharge. An LRA is available when the SVP meets five criteria.[8] RCW 71.09.090 provides the same two paths to a

---

[8] The criteria are as follows:

(1) The person will be treated by a treatment provider who is qualified to provide such treatment in the state of Washington under chapter 18.155 RCW;

(2) the treatment provider has presented a specific course of treatment and has agreed to assume responsibility for such treatment and will report progress to the court on a regular basis, and will report violations immediately to the court, the prosecutor, the supervising community corrections officer, and the superintendent of the special commitment center;

(3) housing exists in Washington that is sufficiently secure to protect the community, and the person or agency providing housing to the conditionally released person has agreed in writing to accept the person, to provide the level of security required by the court, and immediately to report to the court, the prosecutor, the supervising community corrections officer, and the superintendent of the special commitment center if the person leaves the housing to which he or she has been assigned without authorization;

(4) the person is willing to comply with the treatment provider and all requirements imposed by the treatment provider and by the court; and

determination that the SVP meets those criteria as it does for unconditional discharge. First, under RCW 71.09.090(1):

> If the secretary [of DSHS] determines that . . . conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the secretary shall authorize the person to petition the court for conditional release to a less restrictive alternative.

Under this procedure, the SVP files a petition with the court, and the court then sets a hearing within 45 days to determine whether the SVP meets the criteria in RCW 71.09.092. RCW 71.09.090(1).

But RCW 71.09.090(2) provides in part:

> Nothing contained in this chapter shall prohibit the person from otherwise petitioning the court for conditional release to a less restrictive alternative . . . without the secretary's approval. . . . If the person does not affirmatively waive the right to petition, the court shall set a show cause hearing to determine whether probable cause exists to warrant a hearing on whether the person's condition has so changed that . . . conditional release to a proposed less restrictive alternative would be in the best interest of the person and conditions can be imposed that would adequately protect the community.

Thus, as with a petition for unconditional discharge, there are two paths to petition the court for a less restrictive alternative. *If* the secretary finds that conditional release is appropriate, the secretary shall authorize the SVP to file a petition. But the SVP may, in any event, petition the court without the secretary's approval. RCW 71.09.090(1), (2).

Relevant to Pettis's appeal, one of the criteria for a court to order conditional release to an LRA is that "housing exists in Washington that is sufficiently secure to protect the

---

(5) the person will be under the supervision of the department of corrections and is willing to comply with supervision requirements imposed by the department of corrections.

RCW 71.09.092.

community, and the person or agency providing housing to the conditionally released person has agreed in writing to accept the person." RCW 71.09.092(3). The trial court may not find probable cause for an LRA trial unless the SVP provides the court a proposed LRA that meets the criteria in RCW 71.09.092. RCW 71.09.090(2)(d). In other words, the trial court is not permitted to find probable cause to proceed with an LRA trial unless it appears that there is statutorily compliant proposed housing that will accept the SVP. RCW 71.09.090(2)(d).

In any event, regardless of who begins the petition process or which type of release is sought, the trial court may grant a new trial only "when there is current evidence from a licensed professional" of either an "identified physiological change to the person, such as paralysis, stroke, or dementia, that renders the committed person unable to commit a sexually violent act and this change is permanent[,]" or a "change in the person's mental condition brought about through positive response to continuing participation in treatment" indicating that the person either no longer meets the definition of an SVP or meets the criteria for an LRA, as the case may be. RCW 71.09.090(4)(b). Thus, under the statute, although either the DSHS or the SVP may begin the process of seeking a trial for either unconditional discharge or an LRA, such a trial is only available where there is evidence of either a physiological change or a change brought about by "continuing participation in treatment." RCW 71.09.090(4)(b)(ii).

C.   *Allegations Underlying Pettis's Claim Are Unsupported*

Pettis cites unsupported facts and misreads Chapter 71.09 RCW to support his constitutional arguments. Thus, we do not reach his constitutional arguments.

Pettis's argument depends on his allegation that under chapter 71.09 RCW, the SCC administration is the "exclusive gatekeeper" to the SCTF, and that "[o]nly an unwritten SCC

17

policy prevents Mr. Pettis from being transferred to the SCTF." Br. of Appellant at 14. He argues that the "court is powerless to step in if the gatekeepers at the SCC refuse to agree to the person's admission to the SCTF." Br. of Appellant at 14. These allegations form the basis of his constitutional claims. But these contentions lack support from the statute and the record.

As stated above, DSHS may make a finding that an SVP has "so changed" based on treatment or physiological change that he either no longer meets the definition of an SVP, or that conditional release to an LRA (such as the SCTF) would be appropriate. RCW 71.09.090(1). If the DSHS makes such a finding, then it shall permit the SVP to petition the court for a trial. RCW 71.09.090(1). But subsection (2) states plainly that "*[n]othing* contained in this chapter shall prohibit the person from otherwise petitioning the court for conditional release to a less restrictive alternative or unconditional discharge without the secretary's approval." RCW 71.09.090(2) (emphasis added). Thus, the statute plainly demonstrates that the SVP may petition for conditional release to an LRA, regardless of whether the SCC administrators choose to authorize such a petition. RCW 71.09.090(2). Pettis's argument that the court is "powerless" unless the SCC agrees is plainly contrary to the statute.

Furthermore, even accepting for the sake of argument Pettis's contention that both the SCC and the SCTF would prevent Pettis from establishing probable cause for an LRA at the SCTF so long as Pettis was not in treatment, the SCTF is not the only LRA available. Thus, Pettis fails to show that an LRA is unavailable to him, even if the SCC is the "exclusive gatekeeper" to the SCTF. Instead, an SVP may be moved to any LRA where the court finds that "housing exists in Washington that is sufficiently secure to protect the community," among other requirements. RCW 71.09.092(3). Under the statute, secure community transition facilities (one

18

type of LRA) "include but are not limited to the [SCTF[9]] and any community-based facilities established under this chapter and operated by the secretary or under contract with the secretary." RCW 71.09.020(16). And "community LRAs" are an option: under RCW 71.09.092(3), appropriate housing for an LRA can include residing with a member of the community, so long as the statutory factors for an LRA are met. *See* RCW 71.09.345 (discussing LRAs at an SVP's private residence). Thus, the SCTF is just one of many potential LRAs. Even assuming for the sake of argument that the SCTF would not accept Pettis because the SCC would not recommend his transfer, other LRAs were not foreclosed to him.[10]

The statute and the record also contradict Pettis's argument that "[o]nly an unwritten SCC policy prevents Mr. Pettis from being transferred to the SCTF." Br. of Appellant at 14. He bases this argument on depositions from administrators at the SCC, who suggested that the practice at the SCC was not to recommend transferring any SVP who was not currently in treatment.[11] But neither deposition supports Pettis's allegation that "only" the unwritten SCC policy prevented Pettis's transfer to the SCTF. Instead, as stated above, whether or not the SCC recommends an LRA, the SVP may petition the court for an LRA. RCW 71.09.090(2). And

---

[9] The proper noun "Special Commitment Treatment Facility," or SCTF, refers to the specific facility on McNeil Island operated by the DSHS. RCW 71.09.250(1)(a)(i). This should not be confused with "secure community transition facility." RCW 71.09.020(16).

[10] We note, however, that Pettis did not seek transfer to the SCTF, and the record before us therefore does not establish that the SCTF would not have accepted him.

[11] One SCC administrator testified that she believed Pettis was not being "considered" for the SCTF because "he is not actively engaged in treatment right now." CP at 283. A consulting psychologist at the SCC testified similarly that the SCC typically supports placement in the SCTF for SVPs who are currently engaged in treatment, among other factors.

regardless of who begins the process of petitioning for an LRA, the court is not empowered to grant an LRA trial unless the SVP has "so changed" either due to a physiological change or due to ongoing treatment that an LRA is appropriate. RCW 71.09.090(4)(b). In other words, absent a physiological change, the *only* permissible basis for the court to grant a trial on whether an SVP should transfer to an LRA is that he has changed due to *ongoing* treatment. RCW 71.09.090(4)(b). It is undisputed that Pettis did not petition for an LRA until 2013, and that he had not participated in formal treatment since 2011. The statute and the record directly contradict Pettis's argument that the SCC's unwritten policy was the only barrier between him and the SCTF or another LRA.

Finally, Pettis argues that it was "undisputed that he can be safely treated" at the SCTF, but this is not supported by the record. Br. of Appellant at 16. Some experts supported Pettis's move to the SCTF, but others did not. Dr. Carla van Dam, who conducted the 2012 annual review, wrote that placement at the SCTF would not be appropriate. And Dr. Daniel Yanisch, who performed an annual review around the time of trial in 2013, opined that an LRA might be appropriate but did not recommend the SCTF. Finally, the depositions from SCC staff, upon which Pettis relies, demonstrate that the SCC staff did not believe the SCTF would be appropriate for Pettis. Thus, the record does not support the assertion that it was undisputed that the SCTF was appropriate for Pettis. And, as discussed below, this issue was not adjudicated because Pettis did not properly seek an LRA trial.

Pettis's arguments about the unconstitutionality of the SVPA statutory scheme are without merit because the allegations underpinning his argument are unsupported. Thus, we do

20

not consider the merits of his constitutional claim, because the facts as he presents them in his argument are not supported by the statute or the record.

D.      *Pettis Did Not Follow Statutory Procedure for Less Restrictive Alternative*

The State argues that Pettis did not follow the statutory procedure to obtain an LRA. We agree.

To obtain a trial on whether an LRA is appropriate, the SVP must petition the court for a show cause hearing.[12] RCW 71.09.090(1), (2). At the show cause hearing, the trial court determines whether probable cause exists to warrant a hearing on whether the SVP's condition has so changed that conditional release to an LRA is in the best interests of the SVP and the community. RCW 71.09.090(2)(a). The trial court is not permitted under the statute to find probable cause for an LRA trial unless the SVP provides a proposed LRA placement that meets the criteria in RCW 71.09.092. RCW 71.09.090(2)(d).

Here, Pettis did not comply with this statutory procedure. Rather than petitioning the court for a show cause hearing and providing a proposed LRA placement, Pettis petitioned for an unconditional discharge trial. He later moved to seek conditional release in an LRA as part of the unconditional discharge trial, but withdrew that motion. Finally, shortly before his unconditional discharge trial was set to begin, Pettis moved the court for a summary order to compel his placement in the SCTF. At no point did Pettis provide a proposed LRA, apart from merely requesting placement at the SCTF. This petition did not include the required details

---

[12] As described above, the SVP may do this with or without the support of DSHS. RCW 71.09.090(1), (2).

No. 45499-8-II

complying with the statutory criteria for an LRA under RCW 71.09.092. The trial court properly denied this motion.[13] Thus, Pettis did not follow statutory procedures for the court to consider granting him an LRA trial.

## COMMENT ON THE EVIDENCE

Pettis next argues that the trial court impermissibly commented on the evidence by instructing the jury to disregard portions of Dr. Fisher's testimony. We disagree.

We review de novo whether a judge impermissibly commented on the evidence. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). An allegation that a judge impermissibly commented on the evidence may be raised for the first time on appeal. *Levy*, 156 Wn.2d at 719-20.

The Washington Constitution prohibits judges from commenting on the evidence. WASH. CONST. art. IV, § 16. Under this prohibition, a trial court must not "'convey[] to the jury his or her personal attitudes toward the merits of the case' or instruct[] a jury that 'matters of fact have been established as a matter of law." *Levy*, 156 Wn.2d at 721 (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)).

Here, the trial court instructed the jury to disregard "Dr. Fisher's last statements about what the law was in Washington and the housing." VRP at 1066. The context of this instruction is vitally important. During the State's cross-examination of Dr. Fisher, Dr. Fisher began to testify about his understanding of the SVPA. He testified that "if [Pettis] were to be released after this trial, he has to stay in the SCC for a minimum of 30 days for the community

---

[13] Pettis does not appear to challenge this denial.

22

notification process to happen." VRP at 1055-56. Outside the presence of the jury, Pettis's attorneys said that Fisher was testifying based on the attorneys' representations about where SVPs lived after release under the law. After hearing argument from both parties about whether the court should permit the State to continue to cross-examine Fisher about the law, the court decided to instruct the jury to disregard Dr. Fisher's statements about the law.

Pettis argues that "[b]y referencing 'Dr. Fisher's last statements,' and referring broadly to 'the housing,' the court erroneously suggested that Dr. Fisher had made a mistake about more than just 'what the law was in Washington.'" Br. of Appellant at 23 (quoting VRP at 1066). Pettis argues that the court expressed a personal opinion about whether Pettis intended to stay at the SCC after release. Pettis misstates the record.

The record makes clear that Dr. Fisher's understanding of Pettis's "plan" consisted only of Dr. Fisher's erroneous understanding of the law. He testified that "we know that if he were to be released after this trial, he has to stay in the SCC for a minimum of 30 days for the community notification process to happen." VRP at 1055-56. Dr. Fisher's testimony clearly shows that he was testifying to his understanding of the law, not to his understanding of Pettis's factual plans. This is supported by the statements of Pettis's attorneys outside the presence of the jury: they told the trial court that "there's nothing fixed in stone" about Pettis's release plans, and that "we are going to do everything we can to make sure" that he had time after release to enroll in benefits and find housing. VRP at 1058. These statements, read together with Dr. Fisher's testimony that Pettis "has to stay in the SCC for a minimum of 30 days," makes clear that Dr. Fisher could not have been testifying about Pettis's specific release plans. There were

23

No. 45499-8-II

no such plans. Instead, he was testifying about his understanding of the requirements of the statute.

It is undisputed that the SVPA requires a former SVP, upon release, to remain at the SCC for only 24 hours. RCW 71.09.080(7). The law contains no 30-day requirement. Dr. Fisher testified incorrectly that the law contained such a requirement. Any apparently factual statements he made were premised on this incorrect understanding of the SVPA. And because the trial court merely told the jury to disregard Dr. Fisher's incorrect legal testimony about housing, he neither expressed his personal opinion on the merits of the case nor instructed the jury that any matter of fact was established as a matter of law. *Levy*, 156 Wn.2d at 721. Thus, this instruction was not a comment on the evidence.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Pettis further argues that he received ineffective assistance of counsel because his attorneys failed to rebut Dr. Phenix's testimony about Pettis's living situation, and because they failed to rehabilitate Dr. Fisher after the trial court instructed the jury to disregard Dr. Fisher's testimony about the law. We disagree.

To prevail on an ineffective assistance of counsel claim, the defendant must establish that (1) defense counsel's performance was deficient and (2) defense counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700.

24

Our review of counsel's performance is highly deferential. We strongly presume reasonableness. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To rebut the presumption of reasonableness, the defendant bears the burden of establishing the absence of any "'*conceivable* legitimate tactic explaining counsel's performance.'" *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). And to establish prejudice, a defendant must show a reasonable probability that the outcome would have differed absent the deficient performance. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).

A.      *Failure To Rebut Dr. Phenix*

Pettis argues that his trial counsel was deficient for failing to rebut Dr. Phenix's "misleading claim that Mr. Pettis would be homeless and destitute if released." Br. of Appellant at 26. Pettis misstates the record here; Dr. Phenix made no such claim. A search of the record demonstrates that Dr. Phenix never used the term "homeless" or "destitute." Nor did Dr. Phenix testify before the jury that Pettis would lack a home if released: she testified that she based her opinion in part upon Pettis's need for "support, structure, and treatment when he goes out to the community." VRP at 406. She testified that some important aspects of the "structure" that would help Pettis emotionally were housing and income. VRP at 547. And she testified that he had not yet arranged for somewhere to live, nor for a source of income. But these statements did not constitute a "claim that Mr. Pettis would be homeless and destitute if released;" instead, they were a claim that he did not, at the time of trial, have housing arrangements, a source of income, or other sources of support such as family and friend networks. Br. of Appellant at 26.

25

Moreover, the record demonstrates that there was no evidence with which to rebut Dr. Phenix's claim that Pettis had no release plan. Pettis's attorneys told the court that Pettis had no plans for housing or income. Pettis's brief alleges that the "SCC will generally hold a detainee for 30 days after release," and that "Mr. Pettis and his attorneys intended to take advantage of that 30-day period," but his only support for that contention comes from Dr. Fisher's mistaken testimony about the law, and Pettis's attorneys statements that they planned to try to help Pettis stay at the SCC for 30 days. Br. of Appellant at 26. The record contains no evidence that such a plan existed; instead, the record demonstrates that Pettis and his attorneys hoped such a plan could be arranged later.

Thus, because the record establishes that Pettis had no release plan, he fails to carry his burden of demonstrating that there was no *conceivable* legitimate trial tactic behind his attorneys' failure to rebut Dr. Phenix's testimony. *Grier*, 171 Wn.2d at 42. There is a conceivable legitimate trial tactic behind declining to highlight the fact that no release plan existed. Because we hold that Pettis's attorneys were not deficient for failing to rebut Dr. Phenix's testimony, this claim fails. *Strickland*, 466 U.S. at 700.

B.  *Failure To Rehabilitate Dr. Fisher*

Pettis also argues that he received ineffective assistance of counsel because his attorneys failed to rehabilitate Dr. Fisher after the trial court instructed the jury to disregard his incorrect testimony about the law. We disagree.

Because Pettis had no release plan, there was no evidence with which his attorneys could have rehabilitated Dr. Fisher. And as stated above, there was a conceivable legitimate trial tactic behind their decision not to highlight the lack of release plan by having Dr. Fisher testify further.

26

No. 45499-8-II

There is no evidence that Dr. Fisher had any knowledge of Pettis's release plan; instead, he appears to have had knowledge merely of Pettis's attorneys' statements about the law, which were incorrect. We hold that Pettis's attorneys were not deficient for declining to rehabilitate Dr. Fisher because no evidence existed with which to rehabilitate him. Thus, this claim fails. *Strickland*, 466 U.S. at 700.

EVIDENTIARY RULING

Finally, Pettis argues that the trial court erred by admitting evidence that "Mr. Pettis would be homeless and penniless upon his release." Br. of Appellant at 29. We disagree because the trial court admitted no such evidence.

We review a trial court's evidentiary rulings for an abuse of discretion. *In re Detention of Post*, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010). Pettis argues that "the court erred by admitting Dr. Phenix's testimony that Mr. Pettis would be homeless and destitute if released." Br. of Appellant at 29. But as stated above, Dr. Phenix did not testify that Pettis would be "homeless" or "destitute." Instead, she testified that he had no release plan, and that housing and income, among other factors, were important aspects of the "structure" that Pettis would need to succeed upon release. Thus, the evidence that Pettis contests was not admitted at trial, and we do not consider his challenge.

We hold that the SRA-FV tool passes the *Frye* test, and that the trial court did not abuse its discretion by admitting testimony bases on the tool. We do not reach Pettis's constitutional arguments because they depend on unsupported allegations and an incorrect reading of the SVPA and because Pettis did not follow statutory procedures in the trial court when he sought placement in an LRA. In addition, we hold that the trial court did not comment on the evidence

27

No. 45499-8-II

and that Pettis received effective assistance of counsel. Finally, we do not consider Pettis's evidentiary challenge because the trial court did not admit the evidence complained of.

Affirmed.

_____
Worswick, J.

We concur:

_____
Johanson, C.J.

_____
Melnick, J.

28