# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LAKE CHELAN SHORES HOMEOWNERS ASSOCIATION, a Washington non-profit entity, | ) ) ) ) | No. 66636-3-I |
| | ) | DIVISION ONE |
| Appellant, | ) ) | |
| v. | ) ) | ORDER WITHDRAWING OPINION FILED NOVEMBER 28, 2011 AND SUBSTITUTING NEW OPINION |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, a foreign corporation, | ) ) ) | |
| Respondent, | ) ) ) | |
| and | ) ) | |
| NORTHERN INSURANCE COMPANY OF NEW YORK, a foreign corporation, | ) ) ) | |
| Defendant. | ) ) | |

A Special Department of the Washington State Supreme Court granted a petition for review in the above matter on its August 7, 2012 Motion Calendar and remanded the case to the Court of Appeals for consideration in light of <u>Anderson v. Akzo Nobel Coatings, Inc.</u>, 172 Wn.2d 593, 260 P.3d 857 (2011).

In light of the foregoing, this court has determined that the opinion filed on November 28, 2011, shall be withdrawn and a substitute opinion be filed. Now, therefore,

IT IS HEREBY ORDERED that the unpublished opinion of this court filed in the above-entitled action on November 28, 2011 is withdrawn and that the attached published opinion is substituted in its place.

Dated this 19th day of August, 2013.

WE CONCUR:

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LAKE CHELAN SHORES HOMEOWNERS ASSOCIATION, a Washington non-profit entity, | ) ) ) | No. 66636-3-I |
| | ) | DIVISION ONE |
| Appellant, | ) ) | |
| v. | ) ) | |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, a foreign corporation, | ) ) ) | |
| Respondent, | ) ) | PUBLISHED OPINION |
| and | ) ) | |
| NORTHERN INSURANCE COMPANY OF NEW YORK, a foreign corporation, | ) ) ) | |
| Defendant. | ) ) | FILED: August 19, 2013 |

SPEARMAN, A.C.J. — The main issue in this insurance coverage case is whether the method by which expert witnesses for Lake Chelan Shores condominiums homeowners association (LCS) established that "collapse" conditions occurred years earlier was generally accepted within the scientific community. In its summary judgment motion, St. Paul Fire & Marine Insurance Company set forth evidence indicating the methodology of LCS's experts was not generally accepted. The burden then shifted to LCS to come forward with evidence the methodology was generally accepted. Because LCS provided no such evidence, the trial court properly concluded there was no

admissible evidence of "collapse," a prerequisite for coverage under the policy. We affirm.

## FACTS

St. Paul insured the premises of LCS under three annual policies, effective from August 3, 1996 to August 3, 1999. Each of those policies provided coverage for "collapse" that occurred during the policy period:

> **Collapse coverage**. We'll insure covered property against the risk of direct physical loss or damage involving collapse of a building or any part of a building.
>
> The collapse must be due to any of the following causes of loss:
> . . . .
> • hidden decay.

The policies contained the following relevant exclusions from coverage:

> **Exclusions — Losses We Won't Cover**
>
> . . . .
>
> **Collapse**. We won't cover loss resulting from collapse other than that described in the collapse coverage under the Covered Causes Of Loss section.
>
> . . . .
>
> **Wear — tear — deterioration — animals**. We won't cover loss caused or made worse by:
>
> • wear and tear;
>
> • deterioration, mold, wet or dry rot, rust or corrosion including fungal or bacterial contamination . . . .

The LCS condominiums were built between 1980 and 1994. LCS first discovered a problem with rot in mid-2006. LCS hired Olympic Associates, an architectural and engineering firm, to inspect and report on the problem. By April 2007,

LCS had decided to contract for a repair project that would include removal and replacement of all siding. On July 11, 2007, LCS adopted a resolution for financing the project, and on July 27, 2007, it submitted design documents to the City of Chelan Building Department.

LCS tendered its claim to St. Paul on July 5, 2007. On July 23, a St. Paul property adjuster contacted counsel for LCS, and on July 26, the adjuster sent a letter to counsel, asking for documents relating to the loss. Counsel for LCS did not respond to the request. On August 27, counsel for LSC sent a letter to St. Paul, requesting reimbursement for $303,424 in investigation costs. Three days later, on August 30, 2007, LCS sued St. Paul for breach of contract; bad faith; and Consumer Protection Act (CPA) chapter 19.86 RCW, violations.

In July 2009, LCS disclosed its experts' opinions. On the basis of these opinions, St. Paul denied the claim and moved for partial summary judgment as to coverage. St. Paul argued there was no coverage, because LCS's experts had no generally accepted scientific basis on which to link the current building decay to a state of "collapse" during the St. Paul policy periods. In the alternative, St. Paul asked for a Frye[1] hearing on LCS's experts' methods. The trial court agreed with St. Paul, and granted the motion.

LCS then moved to compel discovery as to its remaining extracontractual claims. St. Paul moved for summary judgment on the extracontractual claims. LCS sought a

---

[1] Frye v. United States, 54 App. D.C., 46, 293 F. 1013 (1923).

3

CR 56(f) continuance. The trial court denied LCS's motion and granted St. Paul's motion for summary judgment, dismissing the rest of the claims. LCS appeals.

DISCUSSION

Summary Judgment on Coverage Claims

The trial court granted St. Paul's motion for summary judgment on coverage. The court agreed that the opinions of LCS's experts that the condominiums were in "collapse" 10 years earlier was not based on any theory generally accepted in the scientific community. The trial court thus found LCS had failed to present evidence of coverage, and it granted the motion. We agree with the trial court.

LCS offers multiple arguments as to why this was error, but those arguments rest upon two main, interconnected premises: (1) conflicting opinion testimony offered by opposing experts cannot be resolved at summary judgment and (2) the trial court essentially weighed evidence as if it was presiding over a Frye hearing as opposed to a summary judgment hearing. LCS is correct that disputed opinion testimony, offered by qualified experts, cannot be resolved at summary judgment. See Postema v. Pollution Control Hearings Bd., 142 Wn.2d 68, 119-20, 11 P.3d 726 (2000). In its brief, LCS provides a list comparing and contrasting the expert deposition and declaration testimony of its experts versus St. Paul's expert.

But LCS misunderstands the nature of St. Paul's motion and the trial court's ruling. St. Paul did not ask the trial court to weigh the testimony of opposing experts and the trial court did not do so. St. Paul argued that the opinions of LCS's experts were

4

inadmissible under Frye and in the absence of that testimony, LCS could not establish that collapse occurred during the policy period. St. Paul contended that LCS's experts' opinions were not admissible under Frye because the undisputed evidence showed that the methodology upon which LCS's experts relied to form their opinions was not generally accepted within the scientific community. The trial court agreed and dismissed LCS's collapse coverage claims. The trial court did not err.

For expert testimony regarding novel scientific evidence to be admissible, it first must satisfy the Frye standard and then must meet the other criteria in ER 702. See State v. Gregory, 158 Wn.2d 759, 829-30, 147 P.2d 1201 (2006). Under Frye, expert testimony is admissible where

> (1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant scientific community of which it is a part; and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results.

State v. Sipin, 130 Wn. App. 403, 414, 123 P.3d 862 (2005). Both the theory underlying the evidence and the methodology used to implement the theory must be generally accepted in the scientific community for evidence to be admissible under Frye. Gregory, 158 Wn.2d at 829. When applying the Frye test, courts do not determine if the scientific theory underlying the proposed testimony is correct; rather, courts "must look to see whether the theory has achieved general acceptance in the appropriate scientific community." State v. Riker, 123 Wn.2d 351, 359-60, 869 P.2d 43 (1994). It is not necessary that the relevant scientific community be unanimous in its acceptance of a

5

particular theory or methodology. State v. Gore, 143 Wn.2d 288, 302, 21 P.3d 262 (2001). To perform a Frye analysis, courts consider four sources of information:

> To determine whether a consensus of scientific opinion has been achieved, the reviewing court examines expert testimony, scientific writings that have been subject to peer review and publication, secondary legal sources, and legal authority from other jurisdictions. However, "the relevant inquiry is general acceptance by the scientists, not the courts."

Eakins v. Huber, 154 Wn. App. 592, 599-600, 225 P.3d 1041 (2010) (citations omitted) (quoting State v. Cauthron, 120 Wn.2d 879, 888, 846 P.2d 502 (1993)).

In its motion, St. Paul set forth what it believed showed a lack of general acceptance. The only evidence purporting to show a state of collapse from hidden decay during the St. Paul policy periods came in the form of two opinions from LCS's experts. One of the experts, Justin Franklin, was a civil engineer at Olympic Associates. Regarding whether it was possible to backdate from the present rot condition to the initial onset of a state of collapse, Franklin sent an e-mail in 2006 saying it could not be determined:

> We did an investigation on a building in Chelan which has lots of rotten framing. The attorney for the [homeowner's association] would like to know if we can estimate when the rot occurred. Apparently their insurance coverage ended in 2002 and of course he would like us to state the rot was present in 2002. I told him that all we can say is that the rot presently exists but that we can not [sic] state when the rot and subsequent SSI [substantial structural impairment] occurred.

At his 2009 deposition, however, he claimed to be able to trace the progression of decay at the LCS properties with only two pieces of information: (1) the date each building was built and (2) the depth of the rot when it was uncovered during remediation in 2007-2009. He applied a formula, $y = ax^2 + c$, to trace the progression of rot between

these two times. The formula means that the percentage of decay "y," progresses according to the square of the number of years "x," times a decay rate "a," plus a constant "c." The constant "c" allows for a time lag between completion of construction and the start of decay, which Franklin assumed to be one year.

Franklin then applied the formula $y = ax^2 + 1$ to every area in which Olympic Associates had identified a collapse condition during its 2007-2009 inspection. This application resulted in a series of curves purporting to plot the progression of rot at each location from the time of construction to the time the rot was discovered by Olympic Associates. Franklin assigned a "collapse" point at the first point the rot reached a collapse condition, and then compared that date to policy periods.

Franklin's equation did not come from any scientific literature. Instead, he got it from another Olympic Associates engineer, Lee Dunham. When asked, "What work has Mr. Dunham done to verify the accuracy of that equation that you know of?", Franklin testified, "I don't know." Franklin also testified that the engineers at Olympic Associates simply assumed decay began one year after construction was complete. He did not testify that the assumption was generally accepted in the scientific community. Franklin described his calculations as "educated guesses" and was unable to identify any other person or literature stating his formula is a proper equation for estimating rot progression.

LCS's second expert was Kevin Flynn, a wood scientist from California. Flynn could not identify any support in the scientific community for the proposition that decay

advances according to the square of the number of years as is set forth in Franklin's equation. LCS hired Flynn because it claimed Flynn's use of a software package called "TimberLife" validated Franklin's equation. But neither Flynn nor any other witness testified that it was generally accepted in the scientific community to use TimberLife to determine or confirm when a state of collapse began by working backward from present rot conditions. Instead, Flynn testified that TimberLife is a design tool intended to guide building designers in selecting appropriate building materials.

In its response to the summary judgment motion, LCS argued that the opinions of its experts were not subject to a Frye analysis because the opinions were based on the experts knowledge, experience and training, and because they were not based on novel or new science. Furthermore, even if the opinions were subject to Frye, they were nonetheless admissible because they were based on "accepted scientific knowledge of the process of wood rot...." Clerk's Papers (CP) at 912. And the "use of equations similar to the one used by Mr. Franklin to model the progress of wood decay has been accepted in the scientific community." CP at 913. In support of its opposition to St. Paul's motion, LCS submitted a declaration from Franklin, in which one paragraph addresses whether his formula was generally accepted within the scientific community:

> This is a formula defining an exponential curve which approximates my observations, and those of other engineers in the field. Thus, this formula is merely an equation for graphing the wood rot's lag phase and accelerated growth phase that is universally accepted in the scientific community. Equations such as this are commonly used by engineers and others for various applications.

While Franklin states that it is generally accepted in the scientific community that rot has a lag phase and an accelerated growth phase, he does not say that the formula is generally accepted within the scientific community as a method of backdating when rot has progressed to the point of collapse.

Likewise, in Flynn's declaration only one paragraph appears to discuss the merits of St. Paul's allegations regarding the general acceptance of Franklin's formula:

> Thus, while no single mathematical model has been accepted to the exclusion of others, the concept of applying a mathematical model such as Mr. Franklin's to approximate the exponential curve that describes the progress of wood decay is generally accepted in the scientific community.

Here, Flynn simply states that models approximating exponential curves that describe wood decay are generally accepted. He does not address the critical issue: whether the use of such formulas, and in particular, Franklin's formula, to backdate to the onset of the collapse condition, is generally accepted in the scientific community.

LCS is correct that in general, the moving party on summary judgment bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). However, where a plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" the trial court should grant the motion. Id. at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). A moving defendant may meet the initial burden by "'showing'— that is, pointing out to the [trial] court—that there is an absence of evidence to support the nonmoving party's case." 225 n.1, (quoting Celotex, 477

U.S. at 325). That is exactly what happened here: St. Paul pointed to an absence of evidence that the bases of the opinions offered by LCS's experts were generally accepted and LCS failed to respond. In light of this unrebutted evidence, the trial court did not err in concluding that the opinions were inadmissible and that LCS could not prove a collapse condition existed during the coverage period. Accordingly, the trial court properly granted St. Paul's summary judgment motion.

LCS also contends that <u>Anderson v. Akzo Nobel Coatings, Inc.</u>, 172 Wn.2d 593, 260 P.3d 857 (2011), which was decided shortly before oral argument in this case, is directly on point and requires reversal.[2] We disagree. In <u>Akzo</u>, the Supreme Court reversed the trial court, which had dismissed on grounds that plaintiff failed to demonstrate general acceptance of its theory that a child's mental abnormalities were caused by in utero exposure to toxic materials. The Court held "that the <u>Frye</u> test is not implicated if the theory and the methodology relied upon and used by the expert to reach an opinion on causation is generally accepted by the relevant scientific community." <u>Akzo</u>, 172 Wn.2d at 597. Thus, under <u>Akzo</u>, so long as the science and methods used to generate the opinions about causation are generally accepted in the relevant scientific community, <u>Frye</u> does not require a similar consensus on the ultimate issue of causation.

---

[2] LCS first made this argument in a motion for reconsideration to this court. We denied the motion for reconsideration. The Supreme Court granted LCS's petition for review and remanded to us for reconsideration in light of <u>Azko</u>. By separate order, the previous opinion filed on November 28, 2011 is withdrawn and this opinion is substituted in its place.

LCS contends this case is like Azko. It argues that the science of wood decay is not new or novel but instead is well known and well established. And further, that the mathematical equation used by its experts relies upon that accepted science to draw conclusions about when the rot caused certain buildings to reach a state of collapse. LCS contends the trial court below, like the trial court in Azko, improperly required general acceptance of its experts' conclusions. LCS also argues that because its experts' opinions are based on practical experience and knowledge, Frye is inapplicable. LCS is mistaken on both counts.

Contrary to LCS's arguments, general acceptance of the science of wood decay is not at issue in this case. Rather, the issue here is whether LCS's experts' application of that science, i.e. the formula Franklin used to backdate the decay process to the point of collapse, is generally accepted. See Akzo, 172 Wn.2d at 603 ("Both the scientific theory underlying the evidence and the technique or methodology used to implement it must be generally accepted in the scientific community for evidence to be admissible under Frye"). Stated another way, the issue here is not the scientific community's general acceptance of Franklin's and Flynn's conclusions regarding the onset of the state of collapse, but instead whether the methodology by which those conclusions were reached is generally accepted. Thus, Akzo is of no help to LCS.[3]

---

[3] In statements of supplemental authority, LCS also cites Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 296 P.3d 860 (2013) and Advanced Health Care, Inc. v. Guscott, 173 Wn. App. 857, 295 P.3d 816 (2013). Given both of these cases reiterate the holding in Azko, they have no application here for the reasons stated above.

11

LCS next contends that even if its experts' opinions were properly excluded to the extent they relied upon the mathematical formula, its experts would have reached the same conclusions based solely on their knowledge and practical experience. LCS argues that Frye is inapplicable to opinions founded on this basis. LCS is incorrect.

Knowledge and experience are relevant factors when determining the admissibility of expert opinion testimony under ER 702. But if the testimony concerns novel scientific evidence, the first hurdle to its admissibility is whether it meets the Frye test. See Riker, 123 Wn.2d at 360 n.1 ("Nevertheless, in this state, we continue to adhere to the view that the Frye analysis is a threshold inquiry to be considered in determining the admissibility of evidence under ER 702"). Only if Frye is satisfied do ER 702 considerations, such as knowledge and experience become relevant. State v. Gregory, 158 Wn.2d at 829-30. Moreover, it makes little sense to conclude that an expert could avoid the application of Frye simply by eschewing the use of any particular methodology or technique and purporting to rely only on their knowledge and experience. See Watkins v. Telsmith, Inc., 121 F.3d 984, 991 (5th Cir. 1997). Here, having failed to satisfy Frye, the knowledge and experience of LCS's experts are irrelevant and not a basis for the admission of their opinion testimony.

### Summary Judgment on Extracontractual Claims

LCS next argues the trial court erroneously granted St. Paul's motion for summary judgment on its extracontractual claims, namely the claims for bad faith and CPA violations arising from the alleged failure to adequately investigate, both under a

12

common law duty to investigate and a Washington Administrative Code-imposed duty to investigate. We reject LCS's arguments.

Generally, "[a]n insurer must make a good faith investigation of the facts supporting a claim and may not deny coverage if a reasonable investigation would have proved the insurer's defense to be without merit." Capelouto v. Valley Forge Ins. Co., 98 Wn. App. 7, 18-19, 990 P.2d 414 (1999) (citing Indus. Indem. Co. v. Kallevig, 114 Wn.2d 907, 917, 792 P.2d 520 (1990)). LCS contends that because St. Paul did not undertake its own investigation of the rot, i.e., by removing the exterior cladding on the condominiums to try to determine when the "collapse" occurred, LCS was forced to "incur the full cost of stripping and recladding all 21 buildings at Lake Chelan Shores." We disagree.

As is described above, the method by which LCS claims St. Paul should have attempted to determine the date of "collapse" a decade earlier was not generally accepted in the scientific community. It is difficult to say the trial court erred in concluding such an investigation would not have been "reasonable." Id. at 19. Moreover, any costs LCS incurred in recladding the buildings was not proximately caused by any alleged failure to investigate by St. Paul. Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 64, 204 P.3d 885 (2009) ("If the investigative expense would have been incurred regardless of whether a violation existed, causation cannot be established") citing Sambor v. Omnia Credit Servs., Inc., 183 F. Supp. 2d 1234 (D. Haw. 2002). Indeed, it is undisputed that LCS had decided by April 2007, about three months

13

before LCS even tendered to St. Paul, to contract for a repair project that would include removal and replacement of all siding. The trial court thus properly dismissed LCS's extra-contractual claims.

### Denial of Motions To Compel and Continue

LCS also contends the trial court abused its discretion by denying two motions: (1) a CR 56(f) continuance of St. Paul's summary judgment motion on the extracontractual claims and (2) a motion to compel discovery regarding St. Paul's investigation of LCS's claims. We reject the arguments for the reasons described herein.

A trial court's denial of a motion to compel or a CR 56(f) motion for a continuance are reviewed for an abuse of discretion. See Clarke v. Office of Attorney Gen., 133 Wn. App. 767, 777, 138 P.3d 144 (2006); Mossman v. Rowley, 154 Wn. App. 735, 742, 229 P.3d 812 (2009). "A court abuses its discretion when it bases its decision on unreasonable or untenable grounds." Clarke, 133 Wn. App. at 777 (citing Brand v. Dep't of Labor & Indus., 139 Wn.2d 659, 665, 989 P.2d 1111 (1999)).

Here, the CR 56(f) motion sought a continuance of St. Paul's summary judgment motion on extracontractual claims "until a reasonable date following St. Paul Fire & Marine's compliance with any order issued by this Court following hearing on the Plaintiff's Motion to Compel Discovery." The motion to compel discovery sought "St. Paul's "subrogation file," documents "relating to the investigation of this claim in an

unredacted condition," and supplemental responses to interrogatories about St. Paul's involvement in other claims regarding backdating of rot.

The motion to compel thus sought information relating to St. Paul's alleged deficient investigation. But as is described above, the method by which LCS claims St. Paul should have attempted to investigate was not generally accepted in the scientific community, and any costs LCS incurred in recladding the buildings were not proximately caused by an alleged failure to investigate by St. Paul. In short, the motion sought information not reasonably calculated to lead to admissible evidence, see CR 26(b)(1), and there was no need to continue the summary judgment hearing to obtain such information. As such, the trial court did not abuse its discretion by denying the motion to compel and the CR 56(f) motion for a continuance.

Affirmed.

Spearman, A.C.J.

WE CONCUR:

15