198

[No. 45499-8-II.   Division Two.   June 4, 2015.]

*In the Matter of the Detention of* BRENT PETTIS.

200

*Jodi R. Backlund* and *Skylar T. Brett* (of *Backlund & Mistry*), for appellant.

*Robert W. Ferguson, Attorney General,* and *Mary E. Robnett, Managing Assistant,* for respondent.

¶1  WORSWICK, J. — Brent Pettis appeals his continued civil commitment to the Special Commitment Center (SCC) following a jury verdict in an unconditional discharge trial. He argues that (1) the trial court erred under *Frye*[1] by admitting testimony based on the Structured Risk Assessment—Forensic Version (SRA-FV) tool at trial, (2) his commitment to the SCC rather than the less restrictive Secure Community Treatment Facility (SCTF) violates his substantive and procedural due process rights, (3) the trial court impermissibly commented on the evidence by instructing the jury to disregard Pettis's expert's statements

---

[1] *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923).

about the law, (4) he received ineffective assistance of counsel because his attorneys made no attempt to rebut the State's expert or to rehabilitate Pettis's expert's testimony, and (5) the trial court erred by admitting evidence of what Pettis's living circumstances would be if unconditionally discharged. In the published portion of this opinion, we hold that the trial court did not err by admitting testimony based on the SRA-FV tool under *Frye*. In the unpublished portion of the opinion, we disagree with the remainder of Pettis's assignments of error and affirm.

## FACTS

¶2 In 2002, Brent Pettis stipulated to an order committing him to indefinite total confinement in the SCC. In 2010, 2012, and 2013 annual reviews of Pettis, it was concluded that he remained a sexually violent predator (SVP). Some of these annual reviews opined that Pettis could be treated at a less restrictive alternative (LRA) such as the SCTF, while others did not.

¶3 In 2011, Pettis stopped formal sex offender treatment at the SCC. In 2013 he petitioned for a trial to determine whether he could be unconditionally discharged from the SCC. The trial court granted Pettis's motion for a trial.

¶4 After filing his petition for unconditional release, Pettis moved to "seek conditional release in the alternative . . . during the unconditional release jury trial." Clerk's Papers (CP) at 100. The State opposed this motion to expand the scope of the unconditional discharge trial. Pettis later withdrew this motion.

¶5 Dr. Amy Phenix, retained by the State, evaluated Pettis. Dr. Phenix based her evaluation of Pettis on, among other things, actuarial and clinical risk assessment tools, including the SRA-FV. Dr. Phenix concluded that Pettis continued to meet the definition of an SVP. She also opined that he was "appropriate for release to a less restrictive placement, the SCTF," but he was "not appropriate for unconditional release." Suppl. CP at 404.

¶6 Shortly before the unconditional discharge trial was set to commence, Pettis moved the court for a summary order placing him in the SCTF. He alleged that all of the experts who had examined him thought an LRA, such as confinement at the SCTF, would be appropriate. Beyond requesting transfer to the SCTF, Pettis did not provide the statutorily required details about his proposed LRA. The trial court denied this motion.

¶7 In preparation for trial, Pettis deposed two administrators at the SCC: administrative services chief Cathi Harris and consulting psychologist and former SCC director Dr. Holly Coryell. Both Harris and Dr. Coryell testified that it was the general practice at the SCC not to recommend for transfer to the SCTF any patient not currently in treatment.

¶8 At the unconditional discharge trial, the State presented expert opinion testimony from Dr. Phenix. In response to Dr. Phenix's potential testimony about her evaluation of Pettis, which was based partially on the SRA-FV risk evaluation tool, the trial court held a *Frye* hearing. Dr. Phenix testified that the SRA-FV was widely accepted in the scientific community. At trial, the trial court admitted Dr. Phenix's testimony about the SRA-FV.

¶9 On the basis of the SRA-FV and other evaluation tools, Dr. Phenix testified that Pettis was likely to reoffend if unconditionally discharged. She testified that he was in a high risk group when evaluated under either the SRA-FV or other risk assessment tools.

¶10 At the time of trial, Pettis hoped to remain at the SCC for about 30 days if released, but he had no fixed plans to do so. He also did not have fixed plans to obtain housing in the community. Pettis moved in limine to exclude certain evidence relating to his release plans. He moved to exclude evidence that he had no plans for where to live if released and lacked a source of income and a social support network. The State made an offer of proof outside the presence of the jury that Pettis's lack of housing or income were factors in

Dr. Phenix's opinion that Pettis might lack structure and be likely to reoffend if released. The trial court ruled that Dr. Phenix could testify to the relationship between risk of reoffending and a lack of structure. But the trial court excluded any use of words such as "homelessness," "destitute," and "poverty." Verbatim Report of Proceedings (VRP) at 255, 258-59. Over Pettis's objection, Dr. Phenix then testified that support and structure were very important upon release and that Pettis did not have a source of income, a place to live, or a support network.

¶11 Dr. Fisher testified as Pettis's expert witness. On cross-examination, the State engaged in the following questioning with Dr. Fisher:

Q. Do you know what [Pettis's] housing arrangements are, if any?

A. His housing arrangements are that the social worker will find a place for him to go. They're not going to just kick [him] out of the SCC with 20 bucks for a bus ticket.

Q. This is speculation that they will find him a place to live?

A. No, that's the plan. I don't think that—I mean *we know that if he were to be released after this trial, he has to stay in the SCC for a minimum of 30 days* for the community notification process to happen. So I—I think that's enough time to obtain his [supplemental security income] for disability, get him hooked up with medical insurance providers, and find a place to live with the assistance of the social worker.

VRP at 1055-56 (emphasis added). The State began to impeach Fisher on his understanding of the sexually violent predator act,[2] and Pettis objected.

¶12 Outside the presence of the jury, Pettis's attorneys told the trial court that Dr. Fisher was "testifying based on discussions he's had with us," during which the attorneys appear to have told Fisher that SVPs remained in custody for 30 days after release. After hearing argument from both

---

[2] Ch. 71.09 RCW.

parties about whether the court should permit the State to continue to cross-examine Fisher about the law, the court concluded, "I'm going to instruct the jury that Dr. Fisher's last comments on stating what the law is was inaccurate, to disregard it." VRP at 1065. Then, the trial court instructed the jury as follows:

> Okay. I'm going to give you an instruction. As you heard throughout this trial and particularly at the beginning, there will be times when the Court's going to instruct you on the law. At the conclusion of this trial, I'm going to give you some additional instruction on the law. At this point, one comment I have to make is Dr. Fisher's last statements about what the law was in Washington and the housing, you are to disregard. It was not accurate. It wa—and disregard it. You may move on.

VRP at 1065-66. Pettis did not object. On redirect examination, Pettis's attorneys did not question Fisher further about Pettis's release plans.

¶13 The jury answered yes to the question: "Has the State proved beyond a reasonable doubt that Brent W. Pettis continues to be a sexually-violent predator?" VRP at 1294. Accordingly, the trial court entered an order committing Pettis to the SCC. Pettis appeals.

## ANALYSIS

### FRYE CHALLENGE

¶14 Pettis argues that the trial court erred by allowing the State's expert witness to testify based on the SRA-FV tool, because it was a novel risk assessment that did not meet the test in *Frye*, 293 F. at 1014. We disagree.

### A. *Standard of Review*

¶15 Our review of the admissibility of evidence under *Frye* is de novo, involving a mixed question of law and fact. *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). We undertake "a searching review which may ex-

tend beyond the record and involve consideration of scientific literature as well as secondary legal authority." *Copeland*, 130 Wn.2d at 255-56. We may consider materials that were unavailable until after the *Frye* hearing. *Copeland*, 130 Wn.2d at 256.

¶16 After determining that evidence satisfies the *Frye* test, we evaluate the trial court's admission of that evidence under ER 702. *Copeland*, 130 Wn.2d at 256. We review the trial court's decision whether to admit expert testimony under ER 702 for an abuse of discretion. *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988, *review denied*, 181 Wn.2d 1019 (2014). Expert testimony is admissible under ER 702 "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Such testimony is generally helpful to the trier of fact when "it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). As long as helpfulness is fairly debatable, a trial court does not abuse its discretion by allowing an expert to testify. *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001). And even where the helpfulness of expert testimony is doubtful, we favor admissibility. *State v. King County Dist. Court W. Div.*, 175 Wn. App. 630, 638, 307 P.3d 765, *review denied*, 179 Wn.2d 1006 (2013).

B. *SRA-FV Passes the* Frye *Test*

¶17 Courts in Washington adhere to the *Frye* test in evaluating the admissibility of novel scientific evidence. *Copeland*, 130 Wn.2d at 261. Under *Frye*, novel scientific evidence is admissible only where it is based on methods that are generally accepted in the scientific community. 293 F. at 1014. Testimony is admissible under *Frye* where " '(1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant scien-

tific community of which it is a part;[3] and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results.' " *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 176 Wn. App. 168, 175, 313 P.3d 408 (2013) (quoting *State v. Sipin*, 130 Wn. App. 403, 414, 123 P.3d 862 (2005)), *review denied*, 179 Wn.2d 1019 (2014). This standard does not require unanimity. *Lake Chelan Shores Homeowners Ass'n*, 176 Wn. App. at 176. But evidence is inadmissible under *Frye* if there is a *significant* dispute among *qualified* scientists in the relevant scientific community. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 603, 260 P.3d 857 (2011).

¶18 We do not attempt to determine whether the scientific theory is correct; our review is merely of whether the theory is generally accepted in the scientific community. *Lake Chelan Shores Homeowner's Ass'n*, 176 Wn. App. at 175-76. We may examine judicial decisions from other jurisdictions, but the relevant inquiry is the general acceptance by scientists, not by courts. *State v. Cauthron*, 120 Wn.2d 879, 888, 846 P.2d 502 (1993), *overruled in part on other grounds by State v. Buckner*, 133 Wn.2d 63, 65-66, 941 P.2d 667 (1997).

### 1. *SRA-FV Background*

¶19 The SRA-FV was released in 2010 by Dr. David Thornton, who previously authored other "static" risk assessment tools.[4] VRP at 327. It is a "guideline for assessing the known dynamic risk factors that predict future sexual

---

[3] Pettis concedes that actuarial tools and clinical evaluations are generally admissible under *Frye*. Thus, Pettis does not argue that the scientific theory or principle on which risk assessment tools are based lacks acceptance; he argues instead that the SRA-FV tool lacks general acceptance. We analyze only the SRA-FV tool, not risk assessment methods generally.

[4] A "static" risk factor is one that does not change over time, whereas a "dynamic" risk factor may change. VRP at 302. The major static risk assessment tools in use appear to be the Static-99R and the Static-2002R, both developed in part by Dr. Thornton.

re-offense." VRP at 320. It is a "quantitative measure" allowing psychologists to score risk factors and allowing them to "get an idea of the presence of dynamic risk factors in a structured way." VRP at 320. Dr. Phenix used the SRA-FV, among other tools, in her evaluation of Pettis as "a more precise way and structured way of looking at the presence of [risk] factors" and to help identify "which base rates, or what I call norms, to choose to identify the re-offense rates for sexual re-offense." VRP at 321.

¶20 The SRA-FV was based on a sample of sexual offenders called the "Bridgewater Sample," which used data from 1954 to 1989. VRP at 333. Dr. Phenix testified that studies had revealed that the same dynamic risk factors (such as those tested in the SRA-FV) were predictive for older samples, such as the Bridgewater Sample, and contemporary samples. This suggests that the age of the sample on which the SRA-FV was built and tested did not negatively affect its accuracy. At the time of development in 2010, the SRA-FV was cross-validated on the Bridgewater Sample, but it had not been cross-validated since.

¶21 Dr. Phenix testified that the inter-rater reliability of the SRA-FV was 0.55.[5] She characterized this as "modest" reliability but said that she hoped that in time, after more studies had been done, the inter-rater reliability of the SRA-FV would improve. VRP at 338. She further testified that the statistical predictive accuracy of the SRA-FV was 0.73, which was a "very acceptable predictive accuracy," comparable to the older Static-99R and Static-2002R tools. VRP at 341. And the SRA-FV shows "significant incremental validity in improving the risk assessment over use of the Static-99R alone." Suppl. CP at 398.

### 2. Acceptance of the SRA-FV in the Scientific Community

¶22 At the time of the *Frye* hearing, Dr. Thornton had not yet published a peer-reviewed article describing the

---

[5] "Inter-rater reliability" refers to the likelihood that different practitioners would reach the same result through applying the tool. VRP at 338.

SRA-FV. Dr. Thornton recommended the use of the SRA-FV "primarily in sex-offender evaluations where a person has been incarcerated for a period of time." VRP at 327. Dr. Phenix testified at Pettis's trial that the SRA-FV was "fairly widely used with my colleagues," with the caveat that it was a relatively new instrument, "so it takes time to train all the folks who evaluate sex offenders." VRP at 328. She testified that "Dr. Thornton is a very well-known researcher in the field, so [the SRA-FV has] been fairly widely accepted in cases where offenders have been incarcerated for a lengthy period of time." VRP at 340. Dr. Phenix testified that the SRA-FV had been discussed in practitioners' discussion groups online, and she summarized, "My colleagues are excited about it. It's been accepted by—and most people are—are using it." VRP at 344. She said that once an instrument shows "moderate predictability or above, then generally it's accepted in my field." VRP at 344.

¶23 At the time of the *Frye* hearing, California had adopted the use of the SRA-FV through legislation. And Dr. Phenix testified that in Washington, "many of the evaluators are using the SRA-FV." VRP at 345. She said she had testified about the SRA-FV in several jurisdictions and it had been excluded only once, in New Hampshire, under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) standard.

¶24 After the *Frye* hearing in 2013, California stopped using the SRA-FV without explanation.[6] It is unclear whether California stopped using the SRA-FV due to rejection by the scientific community or for another reason.

¶25 In December 2013, after Pettis's trial, Dr. Thornton published a peer-reviewed article describing the SRA-FV. David Thornton & Raymond Knight, *Construction and Validation of SRA-FV Need Assessment*, SEXUAL ABUSE: J. RES. & TREATMENT XX(X) 1-16 (2013). The SRA-FV has been

---

[6] *Risk Assessment Instruments*, CAL. STATE AUTHORIZED RISK ASSESSMENT TOOL FOR SEX OFFENDERS COMM., http://saratso.org/index.cfm?pid=467 (last visited Apr. 22, 2015).

described favorably in some books: "For non-disabled clients, the [SRA-FV] (Thornton, 2002) . . . enjoy[s] relative degrees of favor, depending on the jurisdiction in which each is used." Robin J. Wilson & David S. Prescott, *Understanding and Responding to Persons with Special Needs Who Have Sexually Offended*, *in* RESPONDING TO SEXUAL OFFENDING: PERCEPTIONS, RISK MANAGEMENT AND PUBLIC PROTECTION 128, 134 (Kieran McCartan ed., 2014); *see also* Alix M. McLearen et al., *Perpetrators of Sexual Violence: Demographics, Assessments, Interventions*, *in* VIOLENT OFFENDERS: UNDERSTANDING AND ASSESSMENT 216, 231 (Christina Pietz et al. eds., 2014) (describing the SRA-FV as a "research-guided multistep framework for assessing the risk presented by a sex offender [that] provides a systematic way of going beyond static risk classification").

¶26 One peer-reviewed article by a practitioner in the field criticizes the SRA-FV's approach. Brian R. Abbott, *The Utility of Assessing "External Risk Factors" When Selecting Static-99R Reference Groups*, 5 OPEN ACCESS J. FORENSIC PSYCHOL. 89, 102 (2013). Dr. Phenix responded to this article in the *Frye* hearing: she acknowledged that "there was quite a bit of criticism from a handful of experts that testify only for the defense in these cases, and Dr. Abbott is one of them." VRP at 352. Dr. Fisher mildly criticized the SRA-FV in his evaluation of Pettis: Dr. Fisher stated that the tool suffered from the shortcoming that it was based on an old sample of offenders. But in his testimony at trial, Dr. Fisher conceded that "some" experts rely on the SRA-FV and Dr. Fisher used the SRA-FV to score Pettis's risk in his own evaluation.

■■ ¶27 We hold that the SRA-FV has been generally accepted in the scientific community. *See Lake Chelan Shores Homeowners Ass'n*, 176 Wn. App. at 175. The sources available, both at the *Frye* hearing below and in the scientific literature, suggest that most practitioners accept the SRA-FV as one of many useful tools to evaluate risk of future sexual offenses. Dr. Phenix testified unequivocally

that the tool was widely accepted in her field due to its good predictive accuracy. And there does not appear to be a *significant* dispute about the acceptance of the SRA-FV. There is some criticism from Dr. Abbott and Dr. Fisher, but the *Frye* standard does not require unanimity. *Lake Chelan Shores Homeowners Ass'n*, 176 Wn. App. at 176.

¶28 We hold that the scientific theory or principle on which the SRA-FV is based has gained general acceptance in the relevant scientific community of which it is a part and thus passes the first prong of the *Frye* test.

### 3. *Accepted Methods of Applying the SRA-FV*

¶29 Dr. Thornton released the SRA-FV at an Association for the Treatment of Sexual Abusers meeting, where he held trainings to assist practitioners in applying the tool. Typically, evaluators use the SRA-FV in conjunction with the older Static-99R tool. Dr. Phenix testified that in addition to the group of researchers who had been trained on the use of the SRA-FV at the time of its release, several hundred other researchers had been trained to use the tool. The SRA-FV involves a coding form, which appears to be an integral part of the tool to standardize a researcher's assessment.

¶30 Dr. Phenix's testimony also suggests there are generally accepted methods of applying the SRA-FV: it involves a specific training and a standard coding form. Pettis argues that the "SRA-FV's low reliability rating, by itself, renders it inadmissible under *Frye*." Br. of Appellant at 20. But *Lake Chelan Shores Homeowners Ass'n* does not support this conclusion. Division One of this court in *Lake Chelan Shores Homeowners Ass'n* held that one factor of *Frye* admissibility is whether " 'there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results,' " but there is no numerical "cutoff" for reliability. 176 Wn. App. at 175 (quoting *Sipin*, 130 Wn. App at 414). Dr. Phenix testified that the inter-rater reliability rating was "modest" but that practitioners accepted it due to its moderate predictability.

¶31 We hold that there are generally accepted methods of applying the SRA-FV in a manner capable of producing reliable results, and thus it passes the second prong of the *Frye* test. Thus, we hold that the SRA-FV passes the *Frye* test.

C. *ER 702: Trial Court Did Not Abuse Its Discretion*

¶32 We hold that the trial court did not abuse its discretion by admitting testimony based on the SRA-FV. Under the deferential standard of ER 702, a trial court does not abuse its discretion by allowing an expert to testify when the helpfulness of the expert's testimony is fairly debatable. *Green*, 182 Wn. App. at 146; *Miller*, 109 Wn. App. at 147.

¶33 Here, Dr. Phenix's testimony was helpful to the jury. She provided scientific, specialized knowledge about SVPs' risk factors that would assist the jury in determining the likelihood that Pettis would reoffend if released. Her opinion, based on multiple risk assessment tools, was helpful to the jury by describing risk factors, risk assessment tools, and the likelihood of reoffense based on those tools. We hold that the trial court did not abuse its discretion by allowing Dr. Phenix to testify about the SRA-FV.

¶34 Affirmed.

¶35 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J., and MELNICK, J., concur.

Review denied at 184 Wn.2d 1025 (2015).