IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | |
| | ) | No. 30845-6-III |
| STEVEN G. RITTER, | ) | |
| | ) | |
| | ) | |
| Petitioner. | ) | OPINION PUBLISHED IN PART |

KORSMO, J. — After remanding for a hearing following our initial consideration of this appeal, we now consider Steven Ritter's challenges to the jury's decision to commit him as a sexually violent predator. In the published portion of this opinion, we address his challenge to the dynamic risk assessment tool used at trial. We affirm.

## FACTS

The salient facts in this appeal largely concern procedural matters. Additional facts related to the issues considered in the unpublished portion of this opinion will be addressed in conjunction with those arguments.

Mr. Ritter, at age 15, sexually assaulted his 46-year-old aunt. He spent about 30 months in juvenile sex offender treatment in Oklahoma and was released at age 18. Within the year, he molested a 9-year-old girl at a public library in Yakima. He was convicted of that offense and served his sentence at the Twin Rivers facility in Monroe.

There were additional uncharged incidents of sexual misconduct as a juvenile that were admitted into evidence at trial.

When his sentence was drawing to a close, the State had Mr. Ritter evaluated by Dr. Dale Arnold. Dr. Arnold applied three actuarial instruments to Mr. Ritter's static risk factors and his own clinical judgment to Mr. Ritter's dynamic risk factors. Dr. Arnold concluded in written reports in 2006 and 2009 that Mr. Ritter met the criteria of a sexually violent predator (SVP). In late 2011, after the State had filed SVP proceedings against Mr. Ritter, Dr. Arnold revised his reports to apply the forensic version of the Structured Risk Assessment—Forensic Version (SRA-FV) to Mr. Ritter's dynamic factors.

Mr. Ritter unsuccessfully tried to exclude use of the SRA-FV and two of the static instruments at trial. After he was committed by the jury, Mr. Ritter timely appealed to this court. His appeal raised four issues, including a challenge to the use of the SRA-FV. We exercised our authority to remand for a *Frye*[1] hearing on that issue. *In re Det. of Ritter*, 177 Wn. App. 519, 520-21, 312 P.3d 723 (2013).

Both sides presented expert testimony at the remand hearing. The State presented the testimony of Dr. Amy Phenix to establish the inception and validity of the SRA-FV. The defense presented two experts: a statistician, Dr. Dale Glaser, and a psychologist, Dr.

---

[1] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

Brian Abbott. The basics of forensic testing were not in dispute. The first step in analyzing a sexual offender's risk of future reconviction is to score that person on one or more of several actuarial instruments. These are widely used, validated, and well-established since at least 1998. They look at the presence or absence of various static factors that affect the risk of sexual reoffense. These static factors are immutable, and consist primarily of facts about the offender and the offense committed, such as number of offenses and the sex of victim(s).

The static factors were established individually by various studies[2] looking at populations of sex offenders that were released from prison, and then correlating reoffense with the presence or absence of the various factors. In 1998, Dr. Karl Hanson published a meta-analytic study, compiling all the existing studies into a cohesive, single framework. This gave rise to the Static-99 actuarial instrument. Subsequent studies and analysis have further refined the factors and given rise to several newer instruments that may incorporate additional factors or structure the analysis differently. All of these instruments have moderate predictive accuracy; employing additional instruments incrementally increases that accuracy.

Because an analysis based only on static risk factors will never change, the psychological community began looking for dynamic factors that could be used both to

---

[2] The impetus for these studies arose out of other studies that showed that treatment did no better than random in predicting reoffense.

refine the risk analysis and help guide treatment. In 2002-2003, Drs. Thornton and Beecham published a series of analytical papers that served as a methodological foundation for the SRA-FV. They looked at each dynamic factor as falling into one of four constructs: sexual interest, relational style, self-management, and attitudes.[3] They posited that in order to have any degree of accuracy, a comprehensive analysis would need to examine at least three of those constructs. They then developed the SRA-FV to examine the first three constructs.[4]

In 2010, a meta-analytic study was published on the research into dynamic risk factors comparable to the 1998 study and provided the statistical basis for developing an instrument based on those dynamic factors. The SRA-FV was released to the psychological community for use that same year, essentially providing a structured application of the meta-analysis. Subsequently, in 2013, Dr. Thornton published a peer-reviewed article establishing the development and validity of the SRA-FV.

A professional administering the SRA-FV looks to their diagnostic interactions with the individual and to facts available in that person's record, and then scores each dynamic risk factor against an operational guideline, from 0 to 2: 0—the factor is absent;

---

[3] For example, sexual interest in children or sexual violence falls into the sexual interest construct, while impulsivity or response to authority falls into the self-management category.

[4] Attitudes were omitted because there is no valid way of determining their presence or absence in an individual.

weighted and summed to arrive at three domain scores, corresponding to those three constructs the instrument is assessing. Higher overall scores on each domain correspond to a higher absolute probability of reoffense. However, the SRA-FV does not return any actual probability of reoffense, but is instead used in conjunction with the Static-99R.

Because the statistical data underpinning the Static-99 was derived from many different studies, those studies were amalgamated in order to create a large population base. However, different data sets involve different types of people. Consequently, as the Static-99 was refined, the instrument was adjusted to account for the varying inherent recidivism rates in the studied populations by separating the studies into several normative groups. Under the revised Static-99R, the examiner must score the static risk factors, then compare that score against one of the normative groups to arrive at a probability that the offender will be convicted of a future sex crime.[5] The SRA-FV is used to sort the individual into one of those normative groups.

The SRA-FV was constructed from a sample obtained from the Massachusetts Hospital in Bridgewater[6] and then cross-validated on a separate sample from that same

---

[5] After arriving at that number, practitioners will also look at individual case factors that may affect their determinations but were not included in the instruments.

[6] The hospital treated high-risk sex offenders who had been civilly committed from the '60s through the '80s.

5

hospital. Trial testimony showed there is some criticism in the psychological community that the dated sample might not correlate with a modern sample. However, contemporary samples employed in comparable instruments, the Stable-2007 and the VRS-SO, suggest that the sample should be accurate. Of note, the SRA-FV sample is the only sample set that includes long-term, incarcerated offenders rather than people in the community. Employing the SRA-FV in conjunction with the Static-99R leads to an incremental increase in predictive accuracy from .68 to .74.

In addition to the Bridgewater sample issue, the SRA-FV was criticized for its lack of construct validity and low inter-rater reliability. All of these were stated limitations in the peer-reviewed article. First, construct validity has not been established for any of the particular dynamic risk factor ratings employed by the SRA-FV. Construct validity refers to a measure of whether a psychometric test measures what it claims to measure. In the context of the SRA-FV, the question is whether the assessment of the particular risk factors and composite constructs actually measures what they purport to measure. The concern is that the mechanisms for measuring the dynamic factors are not identical between the SRA-FV and the studies used to establish correlations between the factors and reoffense.

The final limitation to the SRA-FV is that it has shown a relatively low inter-rater reliability. Essentially, this is a measure of how frequently different people administering

the instrument reach the same result. Although low, it is not low enough to be considered invalid.

After hearing the testimony and reviewing the exhibits, the trial court determined that opinions based on the SRA-FV are admissible under *Frye*. The trial court entered extensive findings of fact and conclusions of law. The parties filed supplemental briefs concerning the *Frye* hearing; Mr. Ritter challenged many of the court's findings. A panel subsequently considered the case without oral argument.

## ANALYSIS

In light of the previous remand, the primary issue presented by this appeal is whether the SRA-FV satisfies the *Frye* standard for admissibility. We conclude, as did Division Two of this court while this matter was on remand, that the SRA-FV does satisfy *Frye*.

Whether novel scientific evidence is admissible presents a mixed question of law and fact which this court reviews de novo. *In re Det. of Pettis*, 188 Wn. App. 198, 204-05, 352 P.3d 841 (2015) (finding that the SRA-FV satisfies *Frye*). *Pettis* involved the same two primary psychological experts who testified in this case—Dr. Amy Phenix and Dr. Brian Abbott. *Id.* at 208-10. Dr. Abbott did not testify in *Pettis*, but his critical article concerning the test was discussed in the opinion. *Id.* at 209.

Washington applies the *Frye* test to gauge whether expert testimony premised on scientific evidence may be admissible. *State v. Copeland*, 130 Wn.2d 244, 261, 922 P.2d

1304 (1996). *Frye* requires that expert testimony be based on principles generally accepted in the scientific community. *State v. Canaday*, 90 Wn.2d 808, 812, 585 P.2d 1185 (1978). The test is two prong: (1) whether the underlying theory is generally accepted in the scientific community, and (2) whether there are techniques utilizing the theory which are capable of producing reliable results. *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994). The court does not assess the reliability of the evidence, but if there is significant dispute between qualified experts as to its validity, it may not be admitted. *Copeland*, 130 Wn.2d at 255. If the scientific principle satisfies *Frye*, the trial court applies ER 702 in determining whether to admit testimony. *Pettis*, 188 Wn. App. at 205. This court reviews the trial court's ER 702 ruling for abuse of discretion. *Id.* Discretion is abused if it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Here, there is no dispute that the principles underlying the SRA-FV are generally accepted in the scientific community. It is based on research linking dynamic risk factors with the probability that a sex offender will reoffend in the future. There also is general agreement that a structured analysis of those factors leads to a more reliable prediction than a haphazard, individualized inquiry. *Accord Pettis*, 188 Wn. App. at 207-10. This is essentially the same process used in applying static risk factors. The first prong of the *Frye* test is satisfied.

8

The real dispute is whether the SRA-FV is capable of producing reliable results, thereby satisfying the second prong of the *Frye* test. The defense challenged the test in the trial court by arguing several weaknesses in the current model. First, the defense experts challenged the efficacy of the test by pointing out the lack of additional[7] validation studies. The statistician, Dr. Glaser, was dissatisfied with the data presented in support of the SRA-FV, but he agreed that what was available did establish that the instrument showed a significant incremental improvement in predictive accuracy. More critically, neither Dr. Glaser nor any other witness suggested that the SRA-FV was inaccurate or produced invalid results.

The defense also challenged the reliability of the test, stressing that the inter-rater reliability was somewhat low. This challenge is significant because inter-rater reliability, the ability of different evaluators to obtain similar results, represents the instrument's precision. Subsequent studies, however, have indicated higher rates of inter-rater reliability that are well within the range accepted by the psychological community. This evidence establishes that there are generally accepted methods of applying the SRA-FV. *Pettis*, 188 Wn. App. at 210.

Finally, at trial and on appeal the defense placed great weight on the lack of construct validity. In psychometric testing, construct validity is of paramount importance

---

[7] The SRA-FV has been cross-validated with the Static-99R.

9

because a test purporting to establish a construct is useless if it does not actually establish that construct. However, the SRA-FV is not primarily a psychometric test; it is a predictive test. Dr. Phenix pointed out that construct validity might be useful in refining the test in the future, but if any of the metric components of the instrument measured something other than what they were supposed to measure, it did not affect the predictive accuracy of the SRA-FV. As with the previous arguments, this challenge is unavailing.

The trial court correctly determined that the arguments presented against the SRA-FV went to the weight of the assessment, not its admissibility. *Pettis*, 188 Wn. App. at 211. Accordingly, we reach the same conclusion that the *Pettis* court did:

> We hold that there are generally accepted methods of applying the SRA-FV in a manner capable of producing reliable results, and thus it passes the second prong of the *Frye* test. Thus, we hold that the SRA-FV passes the *Frye* test.

*Id.*

The trial court properly admitted the SRA-FV assessment in Mr. Ritter's trial. Thus, we affirm the commitment order.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Mr. Ritter presents three additional arguments, although we need not address his cumulative error argument in light of our determination that there was no error. We first address his contention that his substantive due process rights were violated by relying upon evidence of his juvenile conduct and his diagnosis of an antisocial personality disorder. We then turn to his argument that his procedural due process rights were violated by the jury instructions.

*Substantive Due Process*

Mr. Ritter contends that his substantive due process rights were violated both by the reliance on evidence of his sexual misconduct while a juvenile and by use of the diagnosis of antisocial personality disorder. We briefly discuss substantive due process in the context of SVP proceedings before turning to his two specific contentions.

The core concern of substantive due process is the protection from restraint from arbitrary government action. *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). Therefore, a sexually violent predator can only be involuntarily committed if the State proves (1) the person has a mental illness coupled with and linked to serious difficulty controlling behavior and (2) together, these features both pose a danger to the public and sufficiently distinguish the person from a dangerous but typical criminal recidivist. *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 357-60, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997); *In re Det. of Thorell*, 149 Wn.2d 724, 736, 742, 72 P.3d 708 (2003).

11

The legislature codified these mandates in the SVP statute, chapter 71.09 RCW. Three definitions from that chapter are at issue in this appeal. Civil commitment is authorized when the State establishes beyond a reasonable doubt that a person is an SVP—a "person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). A "personality disorder" is defined as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment." RCW 71.09.020(9). "'Likely to engage in predatory acts of sexual violence if not confined in a secure facility' means that the person more probably than not will engage in such acts if released unconditionally from detention on the sexually violent predator petition." RCW 71.09.020(7).

*Juvenile Sexual Misconduct.* Mr. Ritter argues that developing case law and science on juvenile brain development made it unconstitutional to consider his juvenile sexual misconduct at the SVP proceeding. *See Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Miller* v. *Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). All three cases were concerned with questions presented under the Eighth

12

Amendment to the United States Constitution when harsh punishment of crimes committed by juveniles is prescribed or imposed without taking into consideration their relative lack of volitional control.

Unlike the criminal prosecutions under review in the three Supreme Court cases, however, a civil commitment proceeding does not raise an issue of cruel and unusual punishment forbidden by the Eighth Amendment. A criminal prosecution is backward-looking and metes out an appropriate punishment, while a civil commitment proceeding is forward-looking in order to protect the public. A civil commitment proceeding looks back at a respondent's past as a source of relevant evidence, "either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." *Hendricks*, 521 U.S. at 362. Because juvenile misconduct is only evidence and not a basis for punishment in civil commitment proceedings, current brain science raises a substantive due process issue only if it reveals that a respondent's inability to control sexual conduct while a juvenile is not relevant to his or her present or future inability to control behavior.

To demonstrate a deprivation of due process, Mr. Ritter must back up his contention that evidence of sexual misconduct as a juvenile has no probative value in deciding whether a respondent presents a risk of reoffending if not confined in a secure facility. At best, he points to scientific evidence that juveniles' brains are in a state of maturation that increases their prospect of rehabilitation. That does not equate to

13

evidence that acts committed while a juvenile are irrelevant to assessing the risk of their future inability to control behavior. The evidence was relevant.

Here, the defense had the opportunity to cross-examine the State's witness on this topic and make argument to the jury. Due process requires nothing more.

*Antisocial Personality Disorder.* Mr. Ritter also argues that substantive due process considerations barred the State from relying on evidence of his antisocial personality disorder because the definition is overly broad and imprecise given its prevalence among male prisoners. He relies, in part, on *Foucha*, a case where antisocial behavior was at issue.[8]

However, the Washington Supreme Court rejected his reading of *Foucha* in *In re Personal Restraint of Young*, 122 Wn.2d 1, 857 P.2d 989 (1993). Our court noted that unlike the antisocial behavior at issue in *Foucha*, antisocial personality disorder is a recognized personality disorder defined by the Diagnostic and Statistical Manual of Mental Disorders. *Id.* at 37 n.12.

Both of Mr. Ritter's substantive due process arguments are without merit.

---

[8] He also relies on *Crane* and *Hendricks*. However, his reading of those cases is incorrect because neither of those cases forecloses reliance on antisocial personality disorder. 534 U.S. at 411-17; 521 U.S. at 357-60.

*Procedural Due Process*

Mr. Ritter also argues that the definitions from RCW 71.09.020(7) and (18), noted earlier, improperly lower the State's burden of proof. He properly notes that the Washington Supreme Court has rejected this argument, but asks that we reexamine that precedent. We are not in a position to do so.

As recounted previously, those definitions required the State to prove that a respondent's mental abnormality or personality disorder makes him or her *"likely* to engage in predatory acts of sexual violence if not confined in a secure facility," RCW 71.09.020(18) (emphasis added), and that they were "'[l]ikely to engage in predatory acts of sexual violence if not confined in a secure facility' means that the person *more probably than not* will engage in such acts if released unconditionally from detention on the sexually violent predator petition." RCW 71.09.020(7) (emphasis added). He alleges that these definitions conflict with the constitutionally mandated burden of proving an SVP commitment by clear, cogent, and convincing evidence.

Our Supreme Court rejected this same argument more than a decade ago, pointing out that it confuses the burden of proof, which is the degree of confidence the trier of fact should have in the correctness of its conclusions, with a fact to be proved, which in the case of this element, is one couched in terms of statistical probability. *In re Det. of Brooks*, 145 Wn.2d 275, 297, 36 P.3d 1034 (2001), *overruled on other grounds by In re Det. of Thorell*, 149 Wn.2d 724, 72 P.3d 708 (2003). The court pointed out that "RCW

15

71.09.060(1)'s demand that the court or jury determine beyond a reasonable doubt that a defendant is an SVP means that the trier of fact *must have the subjective state of certitude in the factual conclusion that the defendant more likely than not would reoffend* if not confined in a secure facility." *Id.* at 297-98 (emphasis added). One of the "fact[s] to be determined" is "not whether the defendant will reoffend, but whether the probability of the defendant's reoffending exceeds 50 percent." *Id.* at 298. Yet the SVP statute still requires that the fact finder have the subjective belief that it is *at least highly probable* that this fact is true. *Id.*

Mr. Ritter acknowledges that *Brooks* rejected his argument but nonetheless asks that we reexamine *Brooks* in light of later federal and state case law recognizing that involuntary commitment is unconstitutional absent proof that an individual has serious difficulty in controlling behavior. He points to the United States Supreme Court's decision in *Kansas v. Crane* and our Supreme Court's decision in *Thorell.*

It is not this court's place to "reexamine" a decision by the Washington Supreme Court that it has not overruled. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (citing *Godefroy v. Reilly*, 146 Wash. 257, 259, 262 P. 639 (1928)). *Thorell* implicitly rejected Mr. Ritter's suggestion that the State's burden to prove an individual's serious difficulty controlling behavior has ramifications for the State's burden of proving that the individual is "'likely to engage in predatory acts of sexual violence if not confined in a secure facility.'" *Thorell* explicitly approves the language of a to-commit instruction

similar to the pattern instruction in use at the time of this commitment trial. 149 Wn.2d at 742; *cf.* 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 365.10, at 568 (6th ed. 2012). The instruction approved in *Thorell* includes the same "likely to engage in predatory acts" element to which Mr. Ritter objects and that he asks us to reexamine. Yet, according to *Thorell*, the instruction continues to pass constitutional muster because it "requires the fact finder to find a link between a mental abnormality and the likelihood of future acts of sexual violence if not confined in a secure facility." 149 Wn.2d at 743.

Thus, even if we had authority to reconsider a decision of the Washington Supreme court, this is not the case to do so. The procedural due process argument, as *Brooks* already noted, confuses the burden of proof with a fact to be proved. That fact simply does not reduce the State's burden of proof. This argument, too, is without merit.

The commitment order is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____        _____
Siddoway, C.J.                                          Fearing, J.

17