# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DAVID M. SIMMONDS and DEBRA K. SIMMONDS, husband and wife,<br><br>               Appellants,<br><br>v.<br><br>PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE, dba PURE INSURANCE,<br><br>               Respondent. | No. 84081-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Homeowners challenge the denial of insurance coverage for rot damage from a leak surrounding their bedroom shower. After learning about the leak, the insurer engaged multiple experts to investigate and determined that the claim was not covered by the policy because the cause of the leak was an excluded construction defect. The homeowners sued their insurer alleging breach of contract and extra-contractual claims of violations of the Insurance Fair Conduct Act (IFCA) and Consumer Protection Act (CPA). Only the breach of contract claim survived a summary judgment hearing. Following a bench trial, the trial court found in favor of the insurer. We affirm.

Citations and pincites are based on the Westlaw online version of the cited material.

FACTS

David and Debra Simmonds built their home in Redmond, Washington in 1998. At issue is the 2020 discovery of rot in the subfloor and joists underneath a leaky shower that has a glass block shower surround adjacent to their primary bedroom.

In July 2018, Simmonds[1] used a hair dryer to remove what he thought was condensation on some of the glass blocks of the shower. After 45 minutes of heating the bottom glass block, he heard a loud "pop" and saw that he cracked the glass block. Neither he or his wife ever had anyone come out to address the glass block after it cracked.

In August 2020, Simmonds discovered water leaking from a shower handle. When he looked in the crawl space, he discovered significant puddles of water on the visqueen, damp insulation, and rot in the plywood subfloor and flooring joists. The rot was "pretty significant."

Simmonds called his insurer, Privilege Underwriters Reciprocal Exchange d/b/a PURE Insurance (PURE), which has insured the home since 2013. Shawn Roessler was the assigned claim adjuster out of California. Roessler engaged Crawford and Company (Crawford), an independent local adjuster, to review the claim and visit the home. Crawford told Roessler of the possible rot exclusion. Roessler informed Simmonds that she thought the rot exclusion was going to "come into play." Simmonds

---

[1] Because David Simmonds, an attorney who proceeded pro se, is the person who discovered the rot, was the main point of contact with the insurer and their experts, and was the only Simmonds to testify at trial, we use "Simmonds" to refer to David Simmonds while acknowledging that both David and Debra Simmonds are listed as plaintiffs.

then described Washington's efficient proximate cause rule[2] to her, disagreeing with Roessler's assessment of the policy. According to Roessler, at that time both of them thought the rot may be related to the leak from the shower valve. Simmonds therefore believed because that leak was covered the rot should be as well. Roessler told Simmonds that PURE would do an additional review. As a result, PURE retained Washington coverage counsel. PURE also asked American Leak Detection (ALD) to conduct a full inspection.

ALD technician Zachary Schneider conducted the inspection. Schneider confirmed a leak from the right-hand shower valve. The affected area of the closet and wall cavity containing the shower valve did not appear to have any long-term damage.[3] Schneider also did not see rot below that leak area. Testing on the shower pan revealed water manifesting from below the glass block and thermal imaging revealing that the leak was lower than the glass blocks. Based on his observations, including absence of damage to the shower and testing, Schneider concluded that there appeared to be an issue with the shower pan membrane. He testified that when a shower is installed, the membrane is integrated with the shower drain. Then, mortar is placed over everything before laying down the tile; it is the membrane that keeps the water contained. Schneider hypothesized that the membrane may not have been adequately lapped over the threshold dam to provide a proper waterproof seal.

---

[2] The essence of the "efficient proximate cause rule" is that when an insured cause of a loss sets in motion other causes which may not be insured, the loss is covered. Am. States Ins. Co. v. Rancho San Marcos Properties, LLC, 123 Wn. App. 205, 213, 97 P.3d 775 (2004).

[3] Coverage for damage related to the valve leak is not at issue and not part of this appeal.

Schneider had seen leaks develop because membranes were not high enough. He noted that he was not aware of the exact age of the shower, but if someone had built it correctly, it should probably last at least 30 years. Because he did not see anything that appeared to have happened to the shower to have otherwise caused this leak, he believed the membrane issue was "likely either a result of wear and tear or construction defect."

Simmonds had not mentioned the cracked glass block to Schneider during his inspection. Schneider later testified at trial that he did not see any cracked glass during his inspection and a review of the photos he took did not show any cracked glass blocks, but clarified that he did not consider any cracked glass because he knew that "the surround composed of glass blocks is not where the leak was located."

After Schneider's inspection, Simmonds remembered the hairdryer incident and emailed Roessler the next morning asking for a convenient time to talk, explaining, "I think I figured out what happened." After PURE received ALD's report, PURE discussed the claim internally and discussed it with coverage counsel. They determined that the rot-related claim appeared to involve a non-covered loss, which was a construction defect. The policy provides a list of excluded coverage areas including property loss caused by faulty, inadequate, or defective planning; loss caused by presence, growth, proliferation, spread of wet or dry rot; and loss from wear and tear, deterioration or mechanical breakdown. These excluded coverage areas formed the basis of why PURE denied coverage related to the rot. PURE sent Simmonds the ALD report and Simmonds and Roessler spoke by phone. Roessler followed up by emailing

4

Roessler two photos of the cracked glass block that shows a crack that extends to the bottom of the block to the grout line.  Simmonds contested the ALD report.

To address Simmonds' concerns, PURE hired ARCCA structural engineer Kurt Ahlich to conduct a failure analysis.  Ahlich reviewed Schneider's report, met with Simmonds for background, examined the shower and the shower surround, conducted a limited water test of the shower and bathroom floor, and inspected the crawl space and the condition of the wood framing below the shower area.  Ahlich documented the scene, including taking photographs of the cracked glass block.  Water testing revealed heat signatures along the curb of the shower and moisture readings also were elevated along the shower curb, especially the northern part.  Ahlich had considered the hairdryer incident, but stated that the moisture level readings and the heat signature showed that water was leaking along the length of that curb, so it was a wider spread phenomenon than just a point source that one would expect with a glass block.  Ahlich also confirmed some measurements with the layout of the shower with what he saw in the crawl space area.  Ahlich observed that there did not appear to be any wood damage around the drain and Ahlich concluded the grout was working properly.  He did not see anything that would have led him to believe there had been some type of catastrophic event that had damaged it.

Ahlich also consulted with ARCCA materials scientist James Mason.  Mason obtained information from Ahlich and reviewed Ahlich's photographs.  The photographs showed a crack near the top of the glass block.  Mason observed that the cracks did not propagate all the way through the glass, and the cracks in the glass blocks were too

5

small for water to be able to flow through them.  Mason opined that there was not enough energy and force for the cracks to cause any damage to the surrounding area.

After conducting his investigation, Ahlich drafted a report that included observations and conclusions from him and Mason.  The report concluded the following:

> 1. The wood decay in the structural framing underlying the shower stall was the [sic] caused by long-term, ongoing water intrusion at and along the shower curb.  The source of this water was normal use of the shower itself.

> 2. The moisture intrusion along the shower curb was the result of a failure of the shower pan/curb's waterproofing system.  The specific mechanism of leakage through the shower's waterproofing system was indeterminate; however, it was most likely due to penetrations or incomplete coverage of a waterproofing membrane overlaying the curb framing.  Such conditions would be considered construction defects.

> 3. The leakage was a long-term phenomenon, and had been ongoing for a minimum of four to six years.  However, it was most probable that moisture intrusion began to occur around the time the dwelling was constructed.

> 4. The leakage was not caused by the glass block cracking.

The report from ARCCA solidified PURE's decision to deny coverage.  Simmonds continued to dispute PURE's conclusion.  After receiving PURE's coverage opinion, Simmonds emailed PURE a detailed response taking issue with the ARCCA report.  In his response, Simmonds quoted a non-technical online article from aceweekly.com that, in turn, reported that Leslie A. Ferge, a biological technician from the U.S. Department of Agriculture's Forest Products Laboratory, told the author that "[t]here is no way even to crudely estimate the rate of wood decay or its age." Simmonds again included his photos of the cracks in the glass block that reached the bottom of the block.  PURE asked Ahlich to review Simmonds' response and to address

Simmonds' concern about wood decay and its duration.  Ahlich responded in August 2021 by explaining that his estimate of the duration of wood decay was an engineering opinion based on his general understanding of wood decay and experience as an engineer and contractor.  He explained that "the decay had caused complete cross sectional loss of joists and extensive degradation of subflooring; this decay had occurred in an unconditioned space in a relatively cool climate" leading him to conclude that "the decay was a long-term, cumulative condition, the duration of which would be measured in years."

PURE did not change its position that the rot claim was not covered.  Simmonds sued PURE asserting breach of contract and extra-contractual claims of violating the IFCA and the CPA.  As part of its breach of contract claim, Simmonds alleged that PURE did not fairly and objectively investigate his claim.  Simmonds did not retain any of his own experts and chose not to depose any of PURE's experts.

PURE filed a motion for summary judgment on all claims.  Simmonds opposed the motion and in the same pleading also moved for summary judgment and to strike PURE's expert reports.  Without having requested a Frye[4] hearing, Simmonds asserted that expert reports from structural engineer Ahlich and material scientist Mason were not admissible and should be stricken because they did not provide information as to their methodology so that the court could conduct a Frye analysis.  Simmonds cited Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co., 176 Wn.

---

[4] The purpose of a Frye hearing is to determine whether experts reached their conclusions by properly applying accepted underlying principles to the information presented. Frye v. United States, 293 F. 1013, 1013 (D.C. Cir. 1923).

App. 168, 313 P.3d 408 (2013) (rejecting expert's methodology for using a formula to backdate rot decay because it was not shown to be generally accepted in the scientific community) and relied on the article with the quote from Ferge. The trial court had previously granted PURE's motion to strike the article as hearsay and the Ferge quote in the article as double hearsay.[5]

The court granted PURE's summary judgment motion to dismiss the extra-contractual claims but denied summary judgment as to the breach of contract claim. The trial court denied Simmonds' motion to strike the expert reports and denied Simmonds' cross-summary judgment motion because it was not properly raised or noted.

A bench trial was held in April 2022. During motions in limine, Simmonds again moved to exclude Ahlich's and Mason's testimony and their report under Frye and ER 702. This time, Simmonds did not rely on the Ferge quote but did base its argument on this court's holding in Lake Chelan.

During argument, the court asked PURE, "What is the methodology that Mr. Ahlich uses with respect to the wood decay?" PURE read Ahlich's August 2021 response and argued it was a general engineering opinion and not novel subject to Frye. The court agreed, but observed, "I don't think it's easy to put a date on wood decay; but, that goes to weight, not admissibility." The court also rejected Simmonds' other arguments as to PURE's experts.

---

[5] The motion was made in context of what Simmonds submitted to support his motion to compel discovery, which was denied after the court conducted an in-camera review.

At trial, the ALD and ARCCA reports were only admitted for the limited purpose of its effect on PURE's actions and not for the truth of the matter asserted.

Simmonds testified that no communication about water occurred when pest inspectors came to the house in 2014 and covered the dirt surface in the crawl space with a visqueen. During a pest reinspection in 2017, again, there was no communication about water. Simmonds also introduced the photographs he took of the glass block that showed different cracks than in the photos taken by Ahlich. These photos showed cracks that reached the bottom of the block. Simmonds conceded that after he cracked the block in July 2018, he and his wife did not have anyone address the cracks. Simmonds also introduced a photo that showed a cracked grout area at the bottom of the glass blocks near the glass block that was cracked. Simmonds testified that this photo reflects his claim that he had the shower surround grout resealed about a year earlier from when ALD conducted the inspection, which was in August 2020. Simmonds conceded that he did not provide this photo to PURE prior to the filing of the lawsuit but explained it was because he was not aware of it.

Mason testified that sometime after the ARCCA report was written, Mason reviewed another photograph showing a crack near the bottom, though he could not recall the source of that later photograph. He testified to fracture mechanics explaining that cracks require energy to grow, and if there is an excess of energy in the material, the crack grows all the way through and then the excess energy is released. The cracks in the glass block did not go all the way through, meaning it ran out of energy. No fluid flowed through these cracks and there was not enough energy and force for these cracks to cause any damage to the surrounding area.

Simmonds called Frank DiGrande, PURE's Senior Vice President of claims, as a witness. Simmonds asked DiGrande about a declination letter he had reviewed and approved to deny coverage to Simmonds. The letter stated, "The shower pan was not installed correctly (did not fail) contributing to loss and water slipping past the grout as the secondary cause." DiGrande testified that he had inserted "did not fail" into the letter because ALD did not state that the pan had failed. He further testified that had the pan failed, the ensuing loss would have been covered.

Ahlich, unlike Schneider, was aware of the cracked glass block when he conducted his investigation. He testified that his water testing revealed heat signatures and moisture readings along the shower curb. Ahlich explained, "It was a wider spread phenomenon than just a point source that one would expect with just a cracked glass block." After examining the crawl space, Ahlich confirmed measurements with the layout of the shower with what he saw below the crawl space. He did not see anything that would lead him to believe that there had been some catastrophic event that damaged the shower pan. He described the shower pan as primarily a membrane that underlies the tile and mortar of the shower surface. The membrane sits on top of another mortar bed and together they are the shower pan. Ahlich testified that the house was roughly 20 years old, so Ahlich did not think 20 years would have caused the pan failure just purely on wear and tear. Ahlich concluded the cause was a construction defect because the rot was caused by water from the shower that somehow bypassed the shower pan and worked its way into the subfloor and the framing. Ahlich testified that while his report only referenced the interior crack in the glass block, the fact that exterior cracks existed did not change his conclusions. Ahlich explained that how the

light reflected on the glass block influenced how easy or hard it was to see the cracks. Ahlich also opined that even if there had been prior grout repair before his inspection, that would not change his conclusions. Ahlich explained that water goes through grout, and the shower pan is designed to stop water that goes through the grout. Ahlich was asked specifically about the timeframe of the decay on direct examination. Ahlich explained that engineers like himself investigate the length of decay and rot in determining a timeframe. He testified that his process is commonly accepted in the engineering community and involves analysis "of the source of water; the extent of decay, both, you know, in a geographic sense and then also the degree of actual decay in any wood member; and then an analysis of the elements that are present, such as temperature, source of moisture, you know, fuel, you know, being wood and so on." Ahlich opined that the rot was "a longer-term phenomenon and that it had preceded" the hairdryer incident. Simmonds elected not to cross-examine Ahlich.

At the conclusion of trial, the court ruled in favor of PURE, issuing 31 findings of fact and 12 conclusions of law. The court concluded that PURE did everything it needed to do by timely and promptly responding to plaintiffs. PURE engaged experts to investigate the cause of the leak and responded to and addressed plaintiffs' contentions. The court ruled that plaintiffs did not meet their burden in proving that PURE did not deal with them in a manner that was fair. The court found that unopposed testimony and conclusions from Schneider, Ahlich, and Mason supported a finding that the cause of the leak resulting in the rot were issues with the shower curb/pan waterproofing system. The court found that the failures were the result of construction defects, which were excluded under the insurance policy, and that plaintiffs

did not establish that the hairdryer incident caused the leak resulting in the rot. The court concluded that the efficient proximate cause rule did not apply because the loss was caused by faulty construction. The court concluded that plaintiffs did not meet their burden in providing a breach of contract and entered a verdict in favor of PURE.

Simmonds filed a motion for reconsideration under CR 59(a)(3) and (4) and attempted to present measurements he took of his bathroom after trial. The court denied the motion. Simmonds, continuing to appear pro se, appeals.

DISCUSSION

Findings and Conclusions

We first address Simmonds' multiple challenges to the court's findings of fact and conclusions of law.

"[W]here the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." Ridgeview Props. v. Starbuck, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Substantial evidence is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We "will not substitute [our] judgment for that of the trial court even though it might have resolved a factual dispute differently." Id. at 879-80. We apply "a presumption in favor of the trial court's findings, and the party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence." Frank Coluccio Constr. Co. v. King County, 136 Wn. App. 751, 761, 150 P.3d 1147 (2007).

Simmonds first challenges finding of fact 5, which provides, "During the investigation, it was discovered that the subflooring in the crawlspace below the affected shower had extensive rot. There was rot and/or deterioration to the plywood and flooring joists in the area." Simmonds argues that the rot damage was first discovered by Simmonds, not PURE. The finding did not assert that PURE was the first to discover rot. The trial court was merely stating that during PURE's investigation, it discovered rot. Substantial evidence supports finding of fact 5.

Simmonds next challenges finding of fact 8, which provides that "[a]fter [Crawford and Company's] inspection of the crawlspace and wood rot, PURE claim handler, Shawn Roessler, informed [Simmonds] there would be coverage issues related to any rot and arranged to have an additional inspection to determine the cause of the rot." Simmonds takes issue with the court's verbiage "would" instead of "could." Roessler testified that during their phone conversation, she told him that she thought the rot exclusion "would come into play." Substantial evidence supports this finding.

Finding of fact 20 provides that Simmonds "disputed PURE's findings, so PURE retained structural engineer Kurt Ahlich and material scientist James Mason, PhD to inspect and opine as to the cause and duration of the leak." Simmonds calls this a "half-truth" because he prefers additional findings. Substantial evidence supports the court's finding through uncontroverted testimony at trial.

Simmonds also challenges finding of fact 31, which states that DiGrande, "who approved the declination letter to Plaintiffs[,] testified that a failure could be covered under the policy." Simmonds argues that DiGrande testified that a failure "would" be covered if the pan had failed. Simmonds is correct. DiGrande's testimony explained

that ALD did not find that the shower pan had failed, but if the pan had failed, PURE "would appropriately provide coverage" for the ensuing loss. Substantial evidence did not support the trial court's finding that DiGrande testified that a failure *could* be covered if the pan had failed.

We need not separately address the remaining challenged findings 14, 17, 19, 21, and 23-30, because they are encompassed within other issues discussed below.

Simmonds next makes multiple challenges to the court's conclusions of law. We review conclusions of law de novo. Sunnyside, 149 Wn.2d at 880. We must determine whether the findings of fact support the conclusions of law. Brin v. Stutzman, 89 Wn. App. 809, 824, 951 P.2d 291 (1998).

First, Simmonds challenges conclusion of law 3, which provides that the "efficient proximate cause rule does not apply in this case because the loss was caused by faulty construction and resulted in rot—both of which are excluded by unambiguous provisions in the Policy." Simmonds does not provide any argument as to why the efficient proximate cause rule would apply given the evidence admitted at trial. Thus, we do not address this claim. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Next, Simmonds challenges conclusion of law 7: "Use of the term 'failure' does not bring an uncovered claim into coverage. 'Failures' are not specifically covered under the terms of the policy. Only a loss that meets the insuring agreement and is not otherwise excluded would be covered under the policy." Simmonds argues that failures need not be specifically covered under the policy for there to be coverage because he had an all-risks policy. The policy described property coverage as insurance "against all

14

risks of sudden and accidental direct physical loss or damage to your dwelling, contents and other structures unless an exclusion applies." Contrary to Simmonds' suggestion, the court did not conclude that failures must be specifically covered to establish coverage. Simmonds does not otherwise dispute that the loss cannot be a loss that is excluded under the policy.

Simmonds next challenges conclusion of law 8: "Plaintiffs did not establish the claimed loss was covered under the Policy." Simmonds argues that Roessler's testimony agreeing that the specific problem with the installation of the liner could not be identified without demolition of the shower constitutes a system failure and that DiGrande's testimony supports an interpretation that a system failure is covered as part of an all-risks policy. Simmonds mischaracterizes the record. Roessler agreed at trial that she wrote that "with regard to the lack of a known specific problem with the pan liner, we agree that the specific problem with the liner and the way it was installed could not be identified without demolition of the shower." Schneider testified that because he could not take the shower apart, he had no idea what kind of membrane was installed, such as vinyl or a liquid applied painted on membrane. Schneider, from ALD, also testified that he "didn't see anything that would indicate that anything had occurred to the shower to have caused the membrane to fail" and that is why he concluded the leak likely was the result of either wear and tear or a construction defect. DiGrande testified that, in fact, ALD did not find that the pan failed. Simmonds fails to cite to any findings or evidence in the record that contradict the court's conclusion, which is supported by the court's findings of fact.

Simmonds further challenges conclusions of law 10 and 11. Conclusion of law 10 provides, "In handling Plaintiffs' claim, PURE did everything it needed to do. It timely and promptly responded to Plaintiffs, it engaged experts to investigate the cause of the leak, and responded to and addressed Plaintiffs' contentions." Conclusion of law 11 states, "Plaintiffs have not met their burden in proving that PURE did not deal with him in a manner that was less than fair." Simmonds' contention that PURE could have done more does not answer the question of whether PURE's continued response to Simmonds' contentions was less than fair. PURE timely responded to Simmonds in their correspondence, it considered Simmonds' claims and theories when considering coverage, and it hired multiple experts to visit the home and conduct multiple tests. The findings support these conclusions.

Simmonds finally challenges conclusions of law 5, 6, 9, and 12 without providing any argument other than they "do not flow from proper findings of fact." This is not sufficient to warrant review. Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) ("We will not consider an inadequately briefed argument.").

<u>Summary Judgment</u>

Simmonds challenges the trial court's decision to grant PURE's motion for summary judgment and dismiss the extra-contractual claims. Simmonds also challenges the trial court's dismissal of its cross-summary judgment motion on procedural grounds. Simmonds has not properly briefed these issues to warrant review.

This court reviews a summary judgment order de novo, and it engages in the same inquiry as the trial court. Citizens All. for Prop. Rights Legal Fund v. San Juan

<u>County</u>, 181 Wn. App. 538, 542, 326 P.3d 730 (2014).  This court grants summary judgment if there is no genuine issue as to any material fact.  CR 56(c).  When we make this determination, we consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party.  <u>Young v. Key Pharms., Inc.</u>, 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

Simmonds spends a considerable amount of the argument section of his opening brief reciting the facts involving PURE's investigation of the claim.  Simmonds then summarily writes, "As detailed above, *supra* pp. 20-46, and as set forth in their Opposition and Cross-Motion for Summary Judgment, CP 481-488, the Simmonds' CPA, IFCA and bad faith[6] claims are supported by the facts, governing statutory law and administrative regulations, and authoritative caselaw."  Trial court briefs cannot be incorporated into appellate briefs by reference.  <u>Holland v. City of Tacoma</u>, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

Below, PURE had argued that Simmonds' cross-motion should be denied for being substantively and procedurally deficient.  PURE contended Simmonds did not comply with CR 56(c), and King County LCR  7(b)(4)(B), and LCR 7(b)(5).  The trial court denied the cross motion for summary judgment because it "was not properly raised or noted."[7]

Instead of directly addressing the applicable King County local rules to explain why Simmonds believes the court's denial was in error, Simmonds cites to <u>Hood Canal</u>

---

[6] Simmonds' extra-contractual "bad faith" claims related to IFCA.
[7] After Simmonds filed a motion for reconsideration, the trial court denied the motion and clarified that the denial of the cross motion for summary judgment was denied "both substantively and because it was not properly noted."

Sand & Gravel, LLC v. Goldmark, 195 Wn. App. 284, 381 P.3d 95 (2016), a Jefferson County case that has no relevance as to the application of King County local rules.

We decline to address the inadequately briefed issues. Norcon Builders, 161 Wn. App. at 486.

Evidentiary Error

Simmonds next challenges the trial court's denial of motions in limine that related to PURE's experts.

We review evidentiary rulings for abuse of discretion. Hollins v. Zbaraschuk, 200 Wn. App. 578, 580, 402 P.3d 907 (2017). A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. Seattle Times Co. v. Benton County, 99 Wn.2d 251, 261, 661 P.2d 964 (1983) (citing Friedlander v. Friedlander, 80 Wn.2d 293, 298, 494 P.2d 208 (1972); State v. Alford, 25 Wn. App. 661, 665, 611 P.2d 1268 (1980).

First, the trial court denied Simmonds' motion to exclude portions of the ALD report and related testimony under ER 701(c). Simmonds argues that because PURE listed Schneider as a fact witness rather than an expert witness, portions of the ALD report and testimony "based on scientific, technical, or other specialized knowledge within the scope of rule 702" should have been excluded under ER 701(c).[8] The ALD report was only admitted for a limited purpose at trial and not for the truth of the matter

---

[8] Simmonds asserts that this court's review of the trial court's ruling on the motion in limine is de novo because it was "based on its interpretation of a court rule." However, Simmonds is mistaken. The trial court did not interpret any rule, but instead applied the rules to the facts in order to make its determination. The standard of review is abuse of discretion as described above.

asserted. Simmonds provides no citation to authority or argument to support his position, and we decline to address it. RAP 10.3(a)(6); Cowiche Canyon, 118 Wn.2d at 809 (argument unsupported by reference to the record or citation to authority will not be considered).

Next, Simmonds contends that the ARCCA report as well as the testimony of Ahlich and Mason should have been excluded both at summary judgment and at trial under Frye.

In order for expert testimony regarding novel scientific evidence to be admissible, it first must satisfy the Frye standard and then must meet the other criteria in ER 702. Lake Chelan, 176 Wn. App. at 175. "Under Frye, the trial court must exclude evidence that is not based on generally accepted science." L.M. by & through Dussault v. Hamilton, 193 Wn.2d 113, 117, 436 P.3d 803 (2019) (citing Anderson v. Azko Nobel Coatings, Inc., 172 Wn.2d 593, 603, 260 P.3d 857 (2011)). Washington courts apply the Frye standard, asking whether both the underlying scientific principal and the technique employing that principle find "general acceptance in the appropriate scientific community." Lake Chelan, 176 Wn. App. at 175-76 (citation omitted). "Frye excludes testimony based on novel scientific methodology until a scientific consensus decides the methodology is reliable." In re Det. of McGary, 175 Wn. App. 328, 339, 306 P.3d 1005 (2013). "[T]rial courts should admit evidence under Frye if the scientific community generally accepts the science underlying an expert's conclusion; the scientific community does not also have to generally accept the expert's theory of specific causation." L.M., 193 Wn.2d at 129. We review whether the evidence should be barred by Frye de novo. Id. at 128.

First, the ARCCA report was admitted for a limited purpose and not for the truth of the matter asserted. We thus turn to Ahlich's trial testimony.

Simmonds cites to Lake Chelan to argue that Ahlich opining about the timeframe of the rot without identifying a methodology that is generally accepted in the scientific community was error.

In Lake Chelan, this court upheld a summary judgment dismissal on behalf of the insurer because the plaintiffs' experts' use of a formula to link the current building decay to a state of "collapse" during a previous policy period to establish coverage did not satisfy Frye. Lake Chelan, 176 Wn. App. at 175. The insurer set forth evidence indicating the methodology of the plaintiffs' experts was not generally accepted. Id. at 172. This court observed that while the wood expert had stated that models approximating exponential curves that describe wood decay are generally accepted, that did not address the critical issue of whether the civil engineer's formula used to backdate to the onset of the collapse condition is generally accepted in the scientific community. Id. at 179.

Unlike the plaintiff's expert in Lake Chelan, Ahlich did not use a formula and instead testified that engineers like himself investigate the length of decay and rot by analyzing

> the source of water; the extent of decay, both, you know, in a geographic sense and then also the degree of actual decay in any wood member; and then an analysis of the elements that are present, such as temperature, source of moisture, you know, fuel, you know, being wood and so on.

Ahlich testified that this process was commonly accepted in the engineering community. Ahlich opined that he believed the rot was a longer-term phenomenon that preceded the

hairdryer incident. Notably, Simmonds did not present any evidence to contradict Ahlich's testimony. Simmonds did not call his own expert and elected not to cross-examine Ahlich at trial. Unlike the insurer in Lake Chelan, Simmonds never set forth evidence challenging Ahlich's testimony.

Even if it was error for the trial court to have allowed Ahlich to testify that the rot preceded the hairdryer incident, such error was harmless. See State v. Sipin, 130 Wn. App. 403, 421, 123 P.3d 862 (2005) (applying a harmless error analysis when the court improperly admitted evidence under Frye); L.M., 193 Wn.2d at 142 (Gonzalez, J. concurring) (determining the admittance of challenged expert testimony under Frye was harmless error because challenged expert testimony was insignificant when compared to the evidence admitted through otherwise qualified experts). The test for harmless error is whether the outcome of the trial would have been materially affected. Needham v. Dreyer, 11 Wn. App. 2d 479, 497, 454 P.3d 136 (2019).

Even without Ahlich's testimony that the rot began prior to July 2018, there was undisputed evidence that (1) eliminated the cracked glass block as the source of the leak that led to the wood rot, and (2) supported a conclusion that the leak was from shower pan membrane issues that were the result of a construction defect. Mason's testimony eliminated the cracked shower block as the source of the leak or damage to its surroundings. Multiple experts conducted water testing that showed water seepage along the shower curb and not concentrated near the cracked glass block. Both Schneider and Ahlich testified that they did not observe any evidence of damage to the shower. When Schneider testified that it could be a construction defect or wear and tear, he noted that he was not aware of the age of the shower and that one that was

21

built well and maintained should probably last at least 30 years. Ahlich testified that the house was roughly 20 years old and that he did not think 20 years would have caused the pan failure purely on wear and tear, which is why he concluded the leak was because of a construction defect related to the membrane. As the court concluded, the "unopposed testimony and conclusions from Mr. Schneider, Mr. Ahlich, and Dr. Mason support a finding that the cause of the leak resulting [in] the rot were issues with the shower curb/pan waterproofing system. These failures were a result of construction defects, which are excluded under the Policy. The subsequent rot is also excluded under the policy." The policy also excluded wear and tear.

This record does not establish that the trial court erred in denying Simmonds motion to exclude Ahlich's testimony. However, any alleged error regarding the admission of Ahlich's testimony was harmless.[9]

<u>Motion for Reconsideration</u>

Lastly, Simmonds filed a motion for reconsideration under CR 59(a)(3) and (4). CR 59 allows the court to reconsider any decision "materially affecting the substantial rights" of the moving party. CR 59(a). The rule sets out various grounds for reconsideration including the following:

> (3) Accident or surprise which ordinary prudence could not have guarded against;

---

[9] Simmonds also assigns error to the trial court ruling that he had an obligation to supplement discovery by disclosing a voicemail Roessler made to Simmonds' insurance broker. Because the court denied PURE's motion to exclude the voicemail and Simmonds was allowed to use the voicemail as he intended—to impeach Roessler—any alleged error in the court's ruling was harmless and we see no need to further address it. <u>Needham</u>, 11 Wn. App. 2d at 497 (test for harmless error is whether the trial would have been materially affected by the alleged error).

(4) Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial.

CR 59(a)(3-4). However, "CR 59 does not permit a plaintiff to propose new theories of the case that could have been raised before entry of an adverse decision." Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005). Motions for reconsideration are addressed to the sound discretion of the trial court and a reviewing court will not reverse a trial court's ruling absent a showing of manifest abuse of discretion. Perry v. Hamilton, 51 Wn. App. 936, 938, 756 P.2d 150 (1988).

Simmonds makes no attempt to address how his motion satisfies CR 59(a)(3) or (4) and instead attempts to argue the underlying merits. Simmonds has not adequately briefed this issue to warrant review. Norcon Builders, 161 Wn. App. at 486.

Affirm.[10]

_Coburn, J._

WE CONCUR:

_Chung, J._                    _Mann, J._

---

[10] Because we affirm, we need not consider Simmonds' request for attorney fees.